STATE ex rel. OKLAHOMA BAR
ASSOCIATION, Complainant,

v.

Audrey CUMMINGS, Respondent.

OBAD No. 1052.
SCBD No. 3810.

Supreme Court of Oklahoma.

Oct. 5, 1993.

Dan Murdock, Gen. Counsel, Oklahoma Bar Ass'n, Oklahoma City, for complainant.

M. Michael Arnett, Oklahoma City, for respondent.

OPALA, Justice.

In this disciplinary proceeding against a lawyer, the issues to be decided are: (1)

Can an "attorney's retaining lien" be impressed on property which has been entrusted to a lawyer for a specific purpose? and (2) Is a one-year suspension with imposition of costs an excessive sanction for Respondent's breach of professional discipline? We answer both questions in the negative.

The Oklahoma Bar Association [Bar] charged Audrey Cummings [Cummings or Respondent], a licensed lawyer, with one count of professional misconduct. The Bar and Cummings stipulated to some facts in contest. After a disciplinary hearing, a panel of the Professional Responsibility Tribunal [PRT] made findings of fact and conclusions of law together with a recommendation for discipline. The PRT concluded that once Cummings learned that she had improperly deposited client's money in her operating account held by her in trust, she had an obligation to return the funds to the client as she had no right to assert in them an attorney's lien. The PRT recommended that Cummings be suspended from the practice of law for one year and pay the costs of this proceeding.

## FACTS

On April 6, 1990, Donna W. Aaron [Aaron] retained Respondent's firm, Cummings and Associates, to *defend* her against the paternal grandparents' quest for visitation and paid the firm a $600 attorney's fee.[1] Four days later, Respondent and a male associate with the firm met with Aaron and agreed *also to represent her* in a suit to terminate her ex-husband's parental rights. Aaron paid Respondent's law firm $600 for these services and $72 for a filing fee.[2]

The associate, who was handling the two cases, told Aaron that depositions had been scheduled in the grandparents' visitation suit and that $500 was needed to pay the court reporter. On June 7, 1990, the day the depositions were originally set, Aaron

---

1. Aaron signed a contract with Respondent's firm on April 6, 1990. She agreed to pay a $600 "non-refundable retainer" with the balance to be billed at $150 per hour.

2. Aaron signed a second contract with the firm on April 10, 1990. She agreed to pay another $600 non-refundable retainer to be applied against 4 hours of work with the balance to be billed at $150.00 per hour.

delivered a check for $500 to a secretary at Respondent's firm. The deposition hearing did not take place that day because the grandparents' motion for relief had been stricken from the docket. The grandparents eventually abandoned the quest for visitation and the depositions, no longer needed, were never rescheduled. Respondent *deposited the $500 check to cover deposition expense in her operating account* on June 15, 1990.

Sometime in December 1990 or January 1991, the associate informed Aaron there was nothing further they could do for her in the parental termination suit. He also told her that the grandparents had withdrawn their motion for visitation relief and did not intend to pursue the matter. In January 1991 Aaron asked the associate to return the $500 given for deposition expense. He explained that he could not determine if a refund was due until a final bill was computed. After making several phone calls in an attempt to secure the refund, Aaron filed a grievance with the Bar on January 17, 1991.

According to the associate, a bill had been prepared on January 17, 1991, charging a balance due of $105.50.[3] While computing the bill, the associate discovered that the $500 check for the depositions had been deposited in the operating instead of the trust account. Sometime in January or

February 1991 he informed Respondent of this development and told her that Aaron requested this amount to be returned. Respondent refused. She asserted a common-law lien upon the money, which she believed could be applied to the payment of the total bill in both of Aaron's cases.[4] Respondent allegedly based her views on a conversation with a lawyer in the General Counsel's office, although she could not identify the person with whom she had spoken.

In January 1992, one year after the grievance, Respondent and her associate contacted Aaron in an attempt to work out their differences. Respondent agreed to return the $500 if Aaron would write the Bar a letter explaining that their financial differences had been resolved and that she no longer wished to pursue the grievance. Aaron wrote the letter on January 30, 1992, the day she received the check.

The Bar filed a formal complaint against Respondent on March 27, 1992. The PRT found that Respondent's conduct violated Rule 1.4(b),[5] Rules Governing Disciplinary Proceedings, and Rule 1.15(a) and (b),[6] Oklahoma Rules of Professional Conduct, and that discipline should be enhanced because of two prior disciplinary actions taken against Cummings.

---

3. Respondent deducted from the total bill ($1,877.50) payments of legal fees and court costs in the parental termination suit ($672) and in the grandparents' visitation quest ($600) as well as the $500 that had been paid for deposition expense, leaving a balance owing of $105.50.

4. Cummings considered the defense against grandparents' visitation quest as *one case* and Aaron's attempt to terminate her husband's parental rights *as the other*.

5. The terms of Rule 1.4(b), Rules Governing Disciplinary Proceedings, 5 O.S.1991, Ch. 1, App. 1-A, are:
 "(b) Where money or other property has been entrusted to any attorney *for a specific purpose, he must apply it to that purpose.* He may not avail himself of a counterclaim or setoff for fees against any money or other property of his client coming into his hands for such specific purpose, and a *refusal to account for and deliver over such money or*

property upon demand shall be deemed a conversion. *This does not apply to the retention of money or other property otherwise coming into the hands of a lawyer and upon which the lawyer has a valid lien for his services."* (Emphasis added).

6. The pertinent terms of Rule 1.15(a) and (b), Oklahoma Rules of Professional Conduct, 5 O.S. 1991, Ch. 1, App. 3-A, are:
 "(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation *separate from the lawyer's own property* ...
 (b) ... Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property." (Emphasis added).

## I

### THE RECORD BEFORE THE COURT IS COMPLETE FOR A *DE NOVO* CONSIDERATION OF ALL FACTS RELEVANT TO THIS PROCEEDING

▉▉▉ The Oklahoma Supreme Court has exclusive original jurisdiction over the Bar disciplinary proceedings.[7] The court's review is by *de novo* consideration of the case.[8] Neither the trial authority's findings nor its assessments with respect to the weight or credibility of the evidence can bind this court.[9] In a *de novo* consideration, in which the court exercises its constitutionally invested, nondelegable power to regulate both the practice of law and the legal practitioners,[10] a full-scale exploration of all relevant facts is mandatory.[11]

▉▉▉ The court's task cannot be discharged unless the PRT panel submits for a *de novo* examination of all material issues a *complete record* of the proceedings.[12] Our responsibility is to ensure that the record is sufficient for a thorough inquiry into essential facts and for crafting the appropriate discipline[13]—one that would avoid the vice of visiting disparate treatment on the respondent-lawyer.[14]

We hold the record is adequate for our *de novo* consideration of Respondent's offending past conduct.

## II

### RESPONDENT'S RETAINING LIEN CLAIM

#### A.

▉▉▉ Oklahoma law recognizes two types of lien by which a lawyer may secure

---

7. *State ex rel. Okl. Bar Ass'n v. Donnelly,* Okl., 848 P.2d 543, 545 (1992); *State ex rel. Okl. Bar Ass'n v. Raskin,* Okl., 642 P.2d 262, 265 (1982); *Tweedy v. Oklahoma Bar Ass'n,* Okl., 624 P.2d 1049, 1052 (1981); *In re Integration of State Bar of Oklahoma,* 185 Okl. 505, 95 P.2d 113, 115 (1939).

8. *State ex rel. Okl. Bar Ass'n v. Lloyd,* Okl., 787 P.2d 855, 858 (1990) [*Lloyd II*]; *State ex rel. Okl. Bar Ass'n v. Stubblefield,* Okl., 766 P.2d 979, 982 (1988); *State ex rel. Okl. Bar Ass'n v. Cantrell,* Okl., 734 P.2d 1292, 1293 (1987); *Raskin, supra* note 7 at 265–266. Because this court's cognizance of disciplinary proceedings cannot be shared with any other institution, every aspect of the Bar's adjudicative process must be supervised by our *de novo* consideration. This attribute of nondelegable jurisdiction serves to distinguish the conduct of bar disciplinary functions from a *trial de novo*—a retrial in a different court—or even from *de novo appellate review on the record,* which stands for an independent, nondeferential examination of *another tribunal's* record.

9. *Raskin, supra* note 7 at 265. The pertinent terms of Rule 6.15, Rules Governing Disciplinary Proceedings, 5 O.S.1981, Ch. 1, App. 1–A, are:
 "(a) *The Supreme Court may approve the Trial Panel's findings of fact or make its own independent findings, impose discipline, dismiss the proceedings or take such other action as it deems appropriate.*" (Emphasis added).

10. *Raskin, supra* note 7 at 266; *Tweedy, supra* note 7 at 1052.

11. *State ex rel. Okl. Bar Ass'n v. Dugger,* Okl., 385 P.2d 486 (syllabus) (1963).

12. The terms of Rule 6.13, Rules Governing Disciplinary Proceedings, 5 O.S.1981, Ch. 1, App. 1–A, provide in part:
 "... [T]he Trial Panel shall file with the Clerk of the Supreme Court a written report which *shall contain the Trial Panel's findings of fact on all pertinent issues and conclusions of law* ..." (Emphasis added).

13. A complete record is well-nigh necessary for review of a bar disciplinary proceeding. The material to be considered is never to be deemed settled beyond our ability to expand it. The record always remains within this court's *plenary* power to order supplementation. *State ex rel. Okl. Bar Ass'n v. Moss,* Okl., 794 P.2d 403, 404 (1990); *State ex rel. Okl. Bar Ass'n v. Samara,* Okl., 683 P.2d 979, 983 (1984); *State ex rel. Okl. Bar Ass'n v. Warzyn,* Okl., 624 P.2d 1068, 1071 (1981). *See also State ex rel. Okl. Bar Ass'n v. Armstrong,* Okl., 791 P.2d 815, 816 (1990), which teaches that an *interim* suspension of an attorney cannot be made on *an incomplete record.* The same problem confronted this court in *State ex rel. Okl. Bar Ass'n v. Lloyd,* SCBD No. 3455, received November 17, 1987 [*Lloyd I*]. There, we declined to accept the trial authority's recommendation and returned the case for a full evidentiary hearing before the panel whence it came. For an explanation, see *Lloyd II, supra* note 8 at 856.

14. *State ex rel. Okl. Bar Ass'n v. Perceful,* Okl., 796 P.2d 627, 630 (1990).

payment for services: (1) a statutory charging lien [15] and (2) a common-law general possessory or retaining lien.[16] Different transactions or events trigger the application of these two distinct liens. The charging lien, recognized at common law, has been codified in 5 O.S.1991 § 6.[17] A lawyer can assert a § 6 charging lien *only* when he (or she) has *commenced an action on behalf of a client or filed an answer containing a counterclaim, and endorsed on the pleading a notice of a lien claim.*[18] Either event will allow a charging lien to attach to the ultimate verdict, report, decision, finding or judgment that is entered in a client's action or counterclaim.[19] The charging lien may be *actively* enforced and does not rest upon mere possession.[20] Proceeds are also subject to the lien.[21] Because Respondent neither initiated an action for Aaron nor filed a counterclaim, with an appropriate endorsement of lien claim notice, she does not meet the controlling criterion for establishing a statutory charging lien.

▬▬▬ The common-law possessory or retaining lien,[22] on the other hand, has not been adopted by statute. A lawyer may assert a retaining lien against a client's property *only* when: (1) properly chargeable fees are owing and due and (2) the lawyer is in possession of property *not otherwise* designated for a "specific purpose".[23] A common-law retaining lien *cannot be actively enforced by foreclosure.*[24] It is but a lawyer's claim to retain a client's papers, money or property in his (or her)

15. The pertinent terms of 5 O.S.1991 § 6 are:

"From the *commencement of an action, or from the filing of an answer containing a counterclaim,* the attorney who represents the party in whose behalf such pleading is filed shall, to the extent hereinafter specified, *have a lien upon his client's cause of action or counterclaim, and the same shall attach to any verdict, report, decision, finding or judgment in his client's favor; and the proceeds thereof, wherever found, shall be subject to such lien,* and no settlement between the parties without the approval of the attorney shall affect or destroy such lien, provided such attorney serves notice upon the defendant or defendants, or proposed defendant or defendants, in which he shall set forth the nature of the lien he claims and the extent thereof; and said lien shall take effect from and after the service of such notice, but such notice shall not be necessary provided such attorney has filed such pleading in a court of record, and endorsed thereon his name, together with the words 'Lien claimed.' " (Emphasis added).

16. *Republic Underwriters Ins. Co. v. Duncan,* Okl., 713 P.2d 568, 571 (1985); *Burns v. Pratt,* 167 Okl. 546, 31 P.2d 106, 107 (1934); *State v. Dyer,* 126 Okl. 260, 259 P. 212, 214–215 (1927); *Roxana Petroleum Co. of Oklahoma v. Rice,* 109 Okl. 161, 235 P. 502 (8th syllabus) (1925); *American Nat. Bank v. Funk,* 68 Okl. 169, 172 P. 1078, 1081 (1918).

17. For the text of 5 O.S.1991 § 6, see *supra* note 15. *For a discussion of the common-law charging lien see Brauer v. Hotel Associates, Inc.,* 40 N.J. 415, 192 A.2d 831, 834 (1963); *In re Heinsheimer,* 214 N.Y. 361, 108 N.E. 636, 637 (1915); *Akers v. Akers,* 233 Minn. 133, 46 N.W.2d 87, 91 (1951).

18. The terms of 5 O.S.1991 § 6, *supra* note 15, provide in pertinent part that "... said lien shall take effect from and after the service of such notice, but such notice shall not be necessary provided such attorney has filed such pleading in a court of record, and *endorsed thereon his name, together with the words 'Lien claimed.'"* (Emphasis added). *Republic Underwriters, supra* note 16.

19. *See* 5 O.S.1991 § 6, *supra* note 15.

20. *Burns, supra* note 16, 31 P.2d at 108. The power of *active* enforcement connotes the ability to *foreclose* a lien. This concept is to be distinguished from the *passive* character of the retaining lien. The latter does not confer the power of foreclosure. *Id.*

21. *See* 5 O.S.1991 § 6, *supra* note 15.

22. *Republic Underwriters, supra* note 16, 713 P.2d at 571; *Brauer, supra* note 17, 192 A.2d at 834; *Heinsheimer, supra* note 17, 108 N.E. at 637; *Akers, supra* note 17, 46 N.W.2d at 91.

23. *Micheller v. Oberfrank,* 153 N.J.Super. 33, 378 A.2d 1162, 1164 (1977); *Brauer, supra* note 17, 192 A.2d at 833–834; *Akers, supra* note 17, 46 N.W.2d at 92.

24. *Burns, supra* note 16, 31 P.2d at 108. The fact that a retaining lien cannot be *actively enforced* (i.e., by foreclosure) does not diminish its effectiveness to a lawyer. The retention of client's property that comes into the practitioner's hands allows the lawyer *to hold but not liquidate the property* until the counsel fee is paid in full. A client who values the property retained by the lawyer will doubtless attempt to redeem it from the lien.

possession until the fee is satisfied.[25] A lawyer validly exercising this ancient retention power may *not* transform the possessory claim *to an independent benefit* in advance of some agreement with the client.[26]

 Rule 1.4(b) limits the availability of property for attachment of a retaining lien.[27] The rule clearly does *not* permit a lawyer to take money or property entrusted to him for a "specific purpose" and apply it to the attorney's fee claim.[28] *But any money or property otherwise coming into a lawyer's hands and upon which a valid attorney's lien has been impressed is free from this restriction.*[29] The Bar charged Cummings with taking funds entrusted to her *for a specific purpose and with applying them toward a claimed fee in violation of Rule 1.4(b).*[30]

 Respondent asserts that she had impressed a common-law attorney's retaining lien upon the $500 when the special purpose for which the money was held had *ceased to exist.* This occurred, she urges, when the grandparents abandoned their quest for visitation. At this point, Respon-

dent argues, she no longer owed a Rule 1.4(b) duty. For the assertion of an attorney's lien Respondent argues she relied in good faith upon *Republic Underwriters Ins. Co. v. Duncan.*[31]

The Bar counters that *Republic Underwriters* does not support Respondent's position. Its argument is threefold. Firstly, the $500 is not subject to an attorney's lien because Respondent acquired the money for a specific purpose. Secondly, Respondent's actions do not reflect she asserted a lien. Rather, she appropriated the money without Aaron's approval or knowledge, without a court order and previous notice to Aaron that additional monies were owed. Lastly, the Bar contends that even if a retaining lien had attached, the deposit of those funds in Respondent's operating account would constitute a release of possession which operated to destroy the lien.

 Respondent's claim that she was entitled to the $500 because the "special purpose"—the taking of a deposition—no longer existed is without merit. It matters not that the "special purpose" comes to an

---

**25.** *Burns, supra* note 16, 31 P.2d at 107–108; *Dyer, supra* note 16, 259 P. at 215; *Roxana Petroleum, supra* note 16, 235 P. at 507.

**26.** *Republic Underwriters, supra* note 16 at 571.

**27.** For the text of Rule 1.4(b), Rules Governing Disciplinary Proceedings, see *supra* note 5.

**28.** *State ex rel. Okl. Bar Ass'n v. Miskovsky,* Okl., 824 P.2d 1090, 1095–1096 (1991); *State ex rel. Okl. Bar Ass'n v. Brown,* Okl., 773 P.2d 751, 753 (1989); *State ex rel. Okl. Bar Ass'n v. Perkins,* Okl., 757 P.2d 825, 830–831 (1988).

**29.** *See* the text of Rule 1.4(b), *supra* note 5. Florida has interpreted its "specific purpose" rule in a similar fashion. In *Wilkerson v. Olcott,* 212 So.2d 119, 121 (Fla.App.1968), a lawyer holding money for the "specific purpose" of making payments to a client's wife was not allowed to assert a retaining lien. *See also The Florida Bar v. Bratton,* 413 So.2d 754, 755 (Fla. 1982), where a client gave a lawyer money for a bond to be posted in a foreclosure proceeding. When the money was released and was no longer needed for the bond, the lawyer claimed a retaining lien in the sum for fees owed by the client. The court held that a lawyer cannot impose a retaining lien on client's funds entrusted for a specific purpose unless the parties have agreed that fees may be paid out of the entrust-

ed funds. The funds, when released, should have been returned to the client regardless of any outstanding attorney's fees. Other state courts, without relying on disciplinary norms, have applied a *common-law* rule that a retaining lien cannot attach to property designated for a "specific purpose". *See Committee On Professional Ethics And Conduct Of The Iowa State Bar Ass'n v. Nadler,* 445 N.W.2d 358, 361 (Iowa 1989), and numerous cases cited therein.

**30.** For the text of Rule 1.4(b), see *supra* note 5.

**31.** *Supra* note 16 at 571. In *Republic Underwriters,* an action for declaratory relief, the court held that the intervenor (a discharged lawyer) had a retaining lien on insurance proceeds which had been deposited with the court clerk. The client and insurance company had entered into a settlement agreement which provided that a check would be released to the client, to her current lawyer and to the first (discharged) lawyer in full satisfaction of the parties' claims against the insurance company. The first lawyer took possession of and signed the settlement draft for the express purpose of effecting a deposit with the court clerk and to secure an adjudication of his interest in the proceeds. *The court held that the draft's release to the court clerk did not destroy his retaining lien.*

end while the funds are in a lawyer's hands. It is enough that the money was *originally designated* for a "specific purpose". When entrusted with money for a specific purpose a lawyer must not allow his claimed fee for services rendered to conflict with his duties as a fiduciary.[32] Respondent admits that (a) Aaron gave her the $500 for deposition expense, (b) she refused to return it to Aaron after depositing the check in her operating account and (c) Aaron had not agreed to let her use the funds for fee payment. Even though Respondent eventually returned the $500, the restitution of these funds *one year after the grievance had been filed* is not the delivery of a client's money *"upon demand"* within the meaning of Rule 1.4(b).[33] We hold that the Respondent used Aaron's funds for an unauthorized purpose in violation of the cited rule.

### B.

The PRT made several findings which dealt with the legitimacy of Respondent's retaining-lien defense and the Bar's effort to discredit her quest for exoneration on the ground that she was asserting a valid claim to the money placed in her operating account.

The PRT concluded that Respondent's reliance on *Republic Underwriters*[34] in her post-hearing brief asserting an attorney's lien was both legally unfounded and factually fabricated, and that her citation

to the case was misleading to the panel. The PRT based this conclusion on Respondent's testimony that she impressed the lien *after* allegedly talking to an unnamed, unknown lawyer in the General Counsel's office who had advised her that she had a right in the money left for deposition expense.

The PRT found (a) that at the time Respondent claimed to have asserted an attorney's lien, she was not even aware of Rule 1.4(b);[35] and (b) that neither Respondent nor anyone acting in her behalf (1) had researched whether she had the right to assert a common-law retaining lien or (2) had determined the proper procedure for imposing a lien. The PRT concluded that the parties' post-hearing briefs clearly indicate that she did not even follow the procedure suggested in *Republic Underwriters* to preserve an attorney's common-law retaining lien.[36]

The PRT also found that (a) Respondent appeared to have created the entries on the January 17, 1991 bill so that Aaron would owe a balance and (b) not all of the entries appear to correspond to work actually performed. According to Aaron, she never received the bill and saw it for the first time when the Bar sent her Respondent's answer to the grievance, with a copy of the bill appended to that instrument. Aaron disagreed with the amount of time charged for several items on the bill and with the necessity of certain research. Respondent testified that the information was taken off

---

**32.** A contrary rule would invite lax behavior by lawyers holding property or monies designated for a specific purpose. A lawyer could intentionally schedule a deposition, take the client's expense money, cancel the deposition and then claim that because the purpose no longer exists, he is entitled to the funds. The return of expense funds should not be affected by some extraneous event, such as the dismissal of a lawsuit. A lawyer's fiduciary obligation continues until the property has either been returned to the client or an agreement reached for its disposition.

In *State ex rel. Okl. Bar Ass'n v. Miskovsky,* Okl., 804 P.2d 434, 436–437 (1990), a lawyer held money for the specific purpose of preserving an oil and gas lease. When the lease ceased to exist, the lawyer claimed the money for his attorney's fee. We dismissed the charge of a Rule 1.4(c) violation because, unlike in the pres-

ent case, it was *unclear from the record* whether the client *had agreed* to have those funds apply towards payment of an attorney's fee.

**33.** For the text of Rule 1.4(b), see *supra* note 5.

**34.** *Supra* note 16.

**35.** For the text of Rule 1.4(b), see *supra* note 5.

**36.** In *Republic Underwriters, supra* note 16, the court notes that a common-law retaining lien entitles the lawyer *only to keep* in his/her possession lienable documents, property or monies pending satisfaction of any general balance or fee due from the client. Because a lawyer exercising a retention right is not vested with legal title to the retained funds, he may not transform them to an independent benefit in the absence of some agreement with the client.

the firm's ledger book and that her only involvement with the case was the typing of an application for a victim's protection order. She stated that the bill would have been typed and mailed in accordance with her regular office procedures.

We believe, as did the PRT, that Respondent's frivolous attempt to assert a retaining lien in Aaron's $500 left for deposition expense was simply a sham. Her conduct is reprehensible. It warrants imposition of discipline.

## III

## MISHANDLING OF FUNDS

 The Bar has charged Respondent with improperly managing the funds entrusted to her in violation of Rules 1.4(b) [37] and 1.15(a) and (b).[38] We employ three different culpability standards when evaluating *mishandling of funds:* [39] (1) commingling; [40] (2) simple conversion; [41] and (3) misappropriation, i.e., "theft by conversion or otherwise." [42] The degree of culpability ascends from the first to the last.[43] Each offending level must be proved by clear and convincing evidence.[44] The PRT found Respondent guilty of commingling and conversion.

 *Commingling* occurs when the client's funds are combined with the attorney's personal funds.[45] Complete separation of a client's money from that of the lawyer is the only way in which proper accounting can be maintained.[46]

 Cummings admits that on July 15, 1990 she placed the $500 check in her oper-

37. For the text of Rule 1.4(b), see *supra* note 5.

38. For the text of Rule 1.15(a) and (b), see *supra* note 6.

39. These standards were set out in *State ex rel. Okl. Bar Ass'n v. Johnston,* Okl., 863 P.2d 1137 (1993).

40. For the rule against "commingling", see Rule 1.15(a), *supra* note 6, which states in part that "[a] lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property". *Miskovsky, supra* note 28, 824 P.2d at 1098. *See also Johnston, supra* note 39 at 1144.

41. For the rule against "simple conversion", see Rule 1.4(b), *supra* note 5, which states that "[w]here money or other property has been entrusted to any attorney for a specific purpose, he must apply it to that purpose ... and a refusal to account for and deliver over such money or property upon demand shall be deemed a conversion". *Miskovsky, supra* note 32, 804 P.2d at 438; *see also, Johnston, supra* note 39 at 1145.

42. *See* Rule 1.4(c), 5 O.S.1991, Ch. 1, App. 1–A which states that *"[t]heft by conversion or otherwise of the funds of a client shall, if proven, result in disbarment."* (Emphasis added). This level of culpability occurs when a lawyer has *purposefully* deprived a client of money by way of *deceit and fraud.* A lawyer found guilty of intentionally inflicting this type of *grave economic harm* in mishandling clients' funds is deemed to have committed the most grievous degree of offense. *Donnelly, supra* note 7 at 548. A finding that this was done *intentionally,* regardless of exceptional mitigating factors (*Raskin, supra* note 7), mandates the harsh discipline of disbarment. *Miskovsky, supra* note 28 at 824 P.2d at 1101 n. 19; *see also Johnston, supra* note 39.

43. *Johnston, supra* note 39.

44. The terms of Rule 6.12(c), Rules Governing Disciplinary Proceedings, 5 O.S. 1991, Ch. 1, App. 1–A, are:

"To warrant a finding against the respondent in a contested case, the charge or charges *must be established by clear and convincing evidence ....*" (Emphasis added).

45. *Johnston, supra* note 39.

46. When no means exists to account for money, it becomes a fungible unidentifiable property. Once money is combined, the only way a determination can be made of the divisible parts is through the accounting methods employed. The attorney has exclusive reign over the management of entrusted funds. Keeping a client's money separate and distinct ensures that the money is at *all* times properly accounted for and can be shown to be distinct. This serves to prevent a lawyer from deliberately or mistakenly using any of the entrusted funds. "In their daily work lawyers commonly come into clients' funds. The trust placed in the lawyer owes its origin to the special professional status he occupies as a licensed practitioner. Public confidence in the practitioner is essential to the proper functioning of the profession. Few breaches of ethics are as serious as the act of commingling a client's funds and the unwarranted use of his money." *Raskin, supra* note 7; *Johnston, supra* note 39 at 1145 n. 36.

ating account,[47] but asserts that she did not become aware that the check was for deposition expense rather than an attorney's fee until January or February of 1991. Even if we assume that Cummings first learned of this transaction in January 1991, she allowed the money to *remain* [48] in the operating account until January 1992 and is hence guilty of commingling. It is no excuse that the deposit of funds in the operating account may have been occasioned by inaction or neglect of Respondent's secretarial staff in failing to indicate at the time of the check's receipt that it was for costs. A lawyer who is responsible for work done or entrusted to lay personnel in her employment, must supervise staff work and stand responsible for its product.[49]

■ The second level of culpability is *simple conversion*. Rule 1.4(b) reveals that simple conversion occurs when a lawyer applies a client's money to a purpose other than that for which it was entrusted to her.[50] Cummings has steadfastly maintained that she retained the $500 because she was entitled to a common-law retaining lien against those funds. According to Respondent, she had waited a year after the grievance to repay the $500 because she

did not know until she had a conversation with the General Counsel in January 1992 that she could contact a complaining witness. Even then, she paid back the $500, Cummings stated, not because she thought she owed it, but in a "good faith effort to resolve the dispute" and because she became aware that the Bar took the position she was not legally entitled to the deposition expense. She characterized the controversy as primarily a "fee dispute". Cummings was in her associate's office when he talked to Aaron by phone in January 1992 to make arrangement for the money's return. He posed this question to Aaron: "[I]f we give you your $500 back and you're happy, will you write a letter saying that." Aaron agreed. The PRT found that Respondent's action in conditioning the return of the trust monies upon withdrawal of the client's complaint was knowingly perpetrated in an attempt to affect the outcome of the General Counsel's investigation and was "prejudicial to the administration of justice."

■ Even though the purpose for which the funds were given had ceased to exist, Cummings as trustee of those monies should have either returned or transferred

**47.** The $500 check was clearly marked in the upper left hand corner "cv", which, according to Respondent, meant that it was a civil action and was to go to the operating account. She stated that if "cv-to trust" is marked on a check it is to be deposited in the trust account. The $72 check that Aaron paid Respondent's firm for a filing fee contained the marking of "cv-trust", which was properly deposited in Respondent's trust account. Respondent admitted that on both the $500 check for the deposition expense and the $72 check for a filing fee, the "cv" and the "cv-trust", respectively, were in her handwriting. Cummings claims that *someone in her office told her that the $500 check was for an attorney's fee.*

**48.** Even assuming, as Respondent argues, that *Republic Underwriters, supra* note 16, supports her claim to a retaining lien, she would still be guilty of commingling. *Republic Underwriters* teaches that a retaining lien entitles a lawyer *only to retain monies* in his possession pending satisfaction of any general balance or fee due him from the client. A lawyer is not vested with legal title to the retained monies for his own use without an agreement with the client. *Id.* at 571.

Rule 1.15(c), Oklahoma Rules of Professional Conduct, 5 O.S.1991 Ch. 1, App. 3–A, *explicitly* deals with the manner in which a lawyer must handle a client's property that is the subject of a dispute. Rule 1.15(c) provides:

"When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim inter-. ests, the property *shall be kept separate by the lawyer until there is an accounting and severance of their interest. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved."* (Emphasis added).

This rule applies even to a client's funds upon which the lawyer asserts a valid lien. *See generally*, G. Rife, *Trust Accounts (Parts I, II, & III)* (1982)—*Part I* (53 OBJ 21), *Part II* (53 OBJ 1515), *Part III* (53 OBJ 1841).

**49.** *Miskovsky, supra* note 28, 824 P.2d at 1097; *State ex rel. Okl. Bar Ass'n v. Braswell,* Okl., 663 P.2d 1228, 1231–1232 (1983).

**50.** For the text of Rule 1.4(b), see *supra* note 5; *Johnston, supra* note 39; *Miskovsky, supra* note 32, 804 P.2d at 438.

them to her trust account until the dispute was resolved. By applying the $500—clearly intended to pay deposition expenses—toward a claimed fee, Cummings is guilty of simple conversion.[51] No evidence is present here to support the notion that Cummings, through deceit or fraud, intended to deprive Aaron of the $500. Respondent could not hence be found guilty of having *misappropriated* the money.

## IV

## DISCIPLINE TO BE IMPOSED

■ The PRT has recommended that Cummings be suspended from the practice of law for one year and pay all costs in this proceeding. Respondent asserts that the facts do not warrant this severe a sanction. Rather, she would have us impose practice under supervision for ninety days. A less severe discipline would be more appropriate, she urges, because this area of lawyer's conduct is not clear and the Bar has failed to prove a willful or grossly negligent violation.

■ Our responsibility in every disciplinary proceeding is not to punish offensive conduct but rather to inquire into a lawyer's continued fitness with a view towards safeguarding the interests of the public, the courts and those of the legal profession.[52] Disciplinary sanctions not only serve to deter an offending lawyer from committing similar future acts, but also operate as a restraining influence upon others.[53] The discipline we impose today is designed to maintain these policy goals.[54]

Recently, in *State ex rel Okl. Bar Ass'n v. Johnston,*[55] which came to the court on the parties' *stipulation of facts, conclusions of law, mitigating factors and recommendation for discipline,* we imposed a four-month suspension. There, the respondent was found guilty, in a single count, of commingling and conversion of a client's funds, making a false statement to the trial judge, failing to give competent representation, failing to act promptly and failing to communicate with his client. Unlike in the present case, the *Johnston* respondent had not been previously disciplined.

Cummings is charged with commingling and conversion of funds by *impermissibly taking money entrusted for a specific purpose and applying it toward a claimed fee.* The Bar offered evidence that Respondent *has twice before* been disciplined—once in 1987 by a private reprimand before the Professional Responsibility Commission for improper advertising and solicitation and another time in 1991 by public censure administered by *this court in three separate cases*[56] for (1) incompetency and charging an excessive fee, (2) charging an unreasonable attorney's fee and (3) failing to act with reasonable diligence and promptness in representing a client.

A lawyer's license is a certificate of professional fitness to deal with the public as a legal practitioner. Public confidence in the practitioner is essential to the proper functioning of the profession. A lawyer's continuing pattern of misconduct adversely reflects on the entire Bar and exhibits a lack of commitment to the clients, to the courts and to other members of the Bar. While Cummings' post-grievance return of commingled funds resulted in *no* detriment to the client, her actions nonetheless call for

**51.** Respondent's claim—that if her interpretation of *Republic Underwriters, supra* note 16, is incorrect, her "good faith" reliance should protect her—is simply irrelevant. One who converts property acts at his own peril. A mistake of fact or law is no defense. PROSSER AND KEETON ON TORTS, § 15, p. 93 (5th Ed.1984).

**52.** *Donnelly, supra* note 7 at 546; *State ex rel. Okl. Bar Ass'n v. Colston,* Okl., 777 P.2d 920, 925 (1989); *State ex rel. Okl. Bar Ass'n v. Moss,* Okl., 682 P.2d 205, 207 (1983); *State ex rel. Okl. Bar*

*Ass'n v. Harlton,* Okl., 669 P.2d 774, 777 (1983); *Raskin, supra* note 7 at 267.

**53.** *State ex rel. Okl. Bar Ass'n v. Hall,* Okl., 567 P.2d 975, 978 (1977).

**54.** *Raskin, supra* note 7 at 267.

**55.** *See supra* note 39.

**56.** *State ex rel. Okl. Bar Ass'n v. Cummings,* Okl., 815 P.2d 172 (1991).

discipline. The PRT's recommendation that Cummings be suspended from the practice of law for a one-year period and pay the costs is approved. Within thirty days of the date of this opinion, Cummings shall pay the costs in this proceeding in the sum of $1,378.84. Prompt payment is a precondition for Respondent's reinstatement.

Respondent stands suspended from the practice of law for a period of one year from the day this opinion becomes final; costs shall be promptly paid in full as a precondition for her reinstatement.

All Justices concur.