2002 OK 86

**STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**David C. PHILLIPS III, Respondent.**

No. SCBD 4650.

Supreme Court of Oklahoma.

Oct. 29, 2002.

Allen J. Welch, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, for Complainant.

Allen M. Smallwood, Tulsa, for Respondent.

KAUGER, J.

¶ 1 The complainant, Oklahoma Bar Association (Bar Association), charged the respondent, David C. Phillips III, with four

counts of professional misconduct: misappropriation of funds;[1] mismanagement of a trust account;[2] misrepresentation in the investigative proceedings;[3] and an unwillingness to cooperative in the grievance process.[4] The trial panel found, and the Bar concedes, that there is insufficient evidence to support the charges of misappropriation and misrepresentation.[5]

¶2 Upon a *de novo* review,[6] we agree and determine that: 1) clear and convincing evidence[7] supports the charges of mismanagement of a trust account and uncooperativeness in the investigative process by being untimely in responding and neglecting to make a full and fair disclosure; and 2) in consideration of the respondent's misconduct, his lack of a prior disciplinary history, and discipline administered in similar cases, we

determine that the respondent should be suspended for thirty days and pay costs of $1,758.91.[8]

## FACTS

¶3 All counts arise from a relationship with a single client, Dan Cates (Cates), and his medical provider, Kenneth R. Trinidad, D.O. (Trinadad), who filed the grievance. After being injured in an automobile accident on April 23, 1996, Cates retained the respondent who referred him to Trinidad for treatment. Cates incurred approximately $1,500 in medical bills associated with the accident—$440.00 of which were for Trinidad's services.

¶4 The respondent settled Cates' personal injury case on November 14, 1996, for $3,500.00[9] and he deposited the settlement

---

1. Rules 1.5(b) and 8.4(c), Rules of Professional Conduct, 5 O.S.2001, Ch. 1, App. 3–A; Rule 1.4(b), Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A.

2. Rule 1.15(a) and (b), Rules of Professional Conduct, 5 O.S.2001, Ch. 1, App. 3–A; Rule 1.4(b), Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A.

3. Rule 8.1, Rules of Professional Conduct, 5 O.S. 2001, Ch. 1, App. 3–A; Rule 5.2, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A.

4. *Id.*

5. Trial Panel Report, June 10, 2002, providing in pertinent part at p. 2:
   "... Complainant did not carry its burden of proofing [sic] that the Respondent knowingly and willfully misrepresented facts or that Respondent misappropriated funds to his own use...."
   Bar Association's Brief-in-Chief, July 1, 2002, providing in pertinent part:
   at p. 11 "... The Complaint in this matter was drafted in the belief that (1) the Respondent's personal and business expenses were being paid out of his trust account with clients' funds and that (2) the Respondent converted the funds retained towards payment of Cates' medical care providers. The Complainant concedes that these allegations were not established by clear and convincing evidence.... [T]he Complainant has failed to establish the more serious allegations of misappropriation and conversion...."
   at p. 14 "... Upon consideration of Cates' confusing and contradictory testimony, and the corroboration of two witnesses, the Complainant has not established by clear and convincing evidence that the Respondent was to pay Trini-

dad. The Complainant has, consequently, failed to establish the serious allegations (1) that the Respondent misappropriated those funds, and (2) then misrepresented the facts of the matter to the Bar...."
   Admissions in the brief may be regarded as a supplement to the appellate record. *Keating v. Edmondson*, 2001 OK 110, ¶9, 37 P.3d 882; *World Publishing Co. v. White*, 2001 OK 48, ¶19, 32 P.3d 835; *Oklahoma Urban Renewal Auth. v. Medical Technology & Research Auth. of Oklahoma*, 2000 OK 23, ¶14, 4 P.3d 677.

6. *State ex rel. Oklahoma Bar Ass'n v. Erickson*, 2001 OK 66, ¶14, 29 P.3d 550; *State ex rel. Oklahoma Bar Ass'n v. Israel*, 2001 OK 42, ¶13, 25 P.3d 909; *State ex rel. Oklahoma Bar Ass'n v. Smolen*, 2000 OK 95, ¶7, 17 P.3d 456.

7. Rule 6.12, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A; *State ex rel. Oklahoma Bar Ass'n v. Wolfe*, 1997 OK 47, ¶1, 937 P.2d 988; *State ex rel. Oklahoma Bar Ass'n v. Meek*, 1996 OK 119, ¶——, 927 P.2d 553; *State ex rel. Oklahoma Bar Ass'n v. Holden*, 1995 OK 25, ¶1, 895 P.2d 707.

8. Rule 6.12, Rules Governing Disciplinary Proceedings, see note 7, supra; Rules 6.6, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A.

9. The respondent also filed a chapter 13 bankruptcy proceeding on behalf of Cates and his wife on May 23, 1996. Because no chapter 13 plan was prepared, the cause was dismissed on June 19th of the same year. On the same day that the respondent settled the personal injury case, November 14, 1996, the respondent filed a chapter 7 bankruptcy for the Cates. Neither the lawsuit nor the settlement were listed in the bankruptcy forms and no amounts due to medical providers were itemized as debts. Whether the Bar Association initially intended to pursue

check in his trust account. According to the respondent's settlement sheet, disbursals were to be made as follows: $1,038.50 to Cates; $1,166.65 retained for fees; and $1,294.85 withheld as the "total due providers."

¶5 Nevertheless, it is unclear how the settlement funds were actually distributed. Cates' testimony at the hearing was so confused and contradictory about the settlement transactions that the trial panel and the Bar Association agreed that it was not credible.[10]

these facts as an ethical violation is unclear. Nevertheless, it is apparent that, at the time of the hearing, no such contention was presented to the trial panel. Transcript of proceedings, April 2, 2002, providing in pertinent part at pp. 127–28:

"... MR. MORGAN: Mr. Welch, let me ask you a couple of questions if I may. Is the Bar contending that Mr. Phillips violated any disciplinary rules by filing the petition in bankruptcy without listing the assets or the creditors? MR. WELCH: We did not allege that in the complaint. I am reluctant, as I have visited with Mr. Smallwood about in the past, to at a hearing generate new allegations of new violations of different rules of professional conduct. The Supreme Court has on at least one occasion called me to task for that. I try to pay attention. I also think the Supreme Court— you can recommend what you want. The Supreme Court can find what they choose. It could be argued that that is evidence of incompetence and I think it's either incompetence or evidence as I mentioned in my closing argument to corroborate what we allege, that he obtained the funds for the medical care providers. MR. MORGAN: But there's no separate allegation concerning those facts as a disciplinary violation of any particular disciplinary rule? MR. WELCH: That is correct, sir...."

10. Trial panel report, June 10, 2002, providing in pertinent part at p. 3:

"... The Complainant called the former client, Dan Cates, as a witness. Mr. Cates' testimony in [sic] unreliable and quiet [sic] confused. Mr. Cates testified that he only received $436 from the Respondent in connection with the settlements. This is contradicted by evidence that Mr. Cates took a check in the amount of $1,038.50 to a used car lot and purchased an automobile with that check.... When confronted by the documentary evidence Mr. Cates admitted that he and his wife endorsed the check in the amount of $1,038.50 over to a Clayton Jackson to purchase a car.... Mr. Cates' testimony was so confused and contradictory that it is impossible to draw any meaningful conclusions from his testimony...."

The Complainant's brief in chief, July 1, 2002, provides in pertinent part at pp. 5–6:

Although Cates indicated that he only received $436.00 from the respondent, a check was produced which had been drawn on the respondent's trust account for $1,038.50 and which Cates had endorsed over to a used car dealer. When questioned about the events relating to his relationship with the respondent and the disbursal of funds, Cates admitted that his memory regarding the transaction was faulty.[11] However, he did not allege that the respondent had retained any funds to which he was not entitled.[12]

"... Only Cates disputes the testimony of the Respondent and his secretaries. And Cates' testimony is contradictory and not believable. Cates recalled that the Respondent was responsible for all medical care providers.... He also testified that, although he endorsed the check for $1038.50, the Respondent retained that check ... and instead gave him a check for $436 ... which he used to buy a car.... The $1038.50 check from the Respondent to Cates was endorsed not by Respondent but by a Clayton Jackson ('Jackson').... Counsel for the Complainant established that Jackson, a used car dealer, endorsed the $1038.50 check and then applied that sum towards the purchase of an automobile.... Cates testified that he didn't 'know how (Jackson's signature) got there'.... Cates admitted that his memory was not real good ... and that he might not remember exactly what happened...."

11. Transcript of proceedings, April 2, 2002, Dan Cates testifying in pertinent part at:

p. 37 "... Q Your memory is not real good about all this stuff, is it? A Huh-uh...."

p. 39 "... Q If it was drawn on Mr. Phillips' trust account, it would be part of the trust account records. Could it be a lot of this stuff, Mr. Cates, you just don't remember correctly because of the stress you were under? A It could be, you know. It could be on that because just what I can remember, you know, of what went on...."

12. Transcript of proceedings, April 2, 2002, Dan Cates testifying and providing in pertinent part at:

p. 32 "... Q If that in fact happened, you're not claiming that Mr. Phillips kept any of your money at all? A No. Q So the only argument you have with Mr. Phillips is that you claim that Mr. Phillips said he would pay Dr. Trinidad and didn't do so at least on a timely basis; is that correct? A Right...."

p. 40 "... Q Just so the Record is clear, even if the facts are as you say they are, Mr. Phillips never kept any of your money? A Not that I recollect...."

¶ 6 The respondent testified that although the computations on the settlement sheet reflected the manner in which he intended to disburse the settlement funds, Cates insisted that he be given all funds not earmarked as attorney fees. The respondent agreed and extracted a promise from Cates that he would pay the medical providers. Although the respondent could not produce any documentation to support his testimony either in the form of a check drawn on his trust account or an updated settlement sheet, his version of the facts was bolstered by affidavits and testimony from two of his employees—each of them indicated that the money originally earmarked for disbursal to the medical providers was given to Cates at his insistence and upon his promise that he would take responsibility for making the appropriate payments.[13]

¶ 7 The respondent became aware that Cates had not paid the doctors and hospitals when he began receiving solicitations for payment at his office. Originally, the bills were forwarded to Cates. However, Dr. Trinidad contacted the respondent in 1999 concerning his outstanding bill for $440.00. Although the respondent believed it was Cates'

responsibility to pay the sum, he felt obligated to Dr. Trinidad because he had referred his client to the doctor. Therefore, he tendered a check for $440.00 on his trust account to the doctor on August 17, 1999. The check was returned stamped "unavailable funds."

¶ 8 Trinidad filed a grievance with the Bar Association on November 23, 1999, based on the returned check. The Bar Association forwarded the complaint to the Tulsa County Bar Association (County Bar) for investigation.[14] The County Bar sent the respondent a copy of the complaint on November 24, 1999, requesting a written response within twenty days and explaining that failure to respond timely would result in a referral to the Bar Association for further consideration.[15] On December 20, 1999, the respondent called the County Bar and told the investigator that Trinidad had been paid.[16] The investigator again asked for a written response. When none was forthcoming, the investigator wrote the respondent with a third plea on January 11, 2000. A fourth request was forwarded on March 21, 2000. The respondent finally wrote the County Bar on April 25, 2000. However, the letter con-

13. Affidavit of Phyllis McConah, April 16, 2001, providing in pertinent part:

". . That at the time of Mr. Dan Cate's settlement, he requested that he be allowed to pay his medical bills as he had a dire financial emergency.
That I prepared the settlement computations sheet. That after preparing the sheet, Mr. Cates expressed the desire to pay the medical providers himself. . . ."
Affidavit of Beverly Jo Wagner, April 9, 2001, providing in pertinent part:
". . . That I was aware that, at the time of Mr. Dan Cate's settlement, he requested that he be allowed to pay his medical bills as he had a dire financial emergency.
That, due to his financial problems, David C. Phillips dispersed the monies to him with the understanding that he would make arrangements to pay the medical providers. . . ."
Transcript of proceedings, April 2, 2002, Beverly Wagner testifying and providing in pertinent part at pp. 96–97:
". . . Q What was your understanding of who was to be responsible for paying the medical providers?
A Mr. Cates.
Q And how did you arrive at that understanding?
A The money was given to him because he was in such dire straits was my understanding.

Q And he was supposed to use that to pay the medical providers?
A Was to make arrangements with them to make the payments, yes. . . ."
Transcript of proceedings, April 2, 2002, Phyllis McConaha testifying and providing in pertinent part at pp. 106–07:
". . . Q And do you recall if there was any understanding with David Phillips and the Cates as to who was to be responsible for paying the medical providers, specifically including Dr. Kenneth Trinidad?
A I will tell you what—tell the tribunal what I told you and Mr. Welch is I started to prepare that document and I was told by David not to do that, that David was going to just go ahead and give Mr. Cates the money and that Mr. Cates would then be responsible to pay the providers. . . ."

14. Rule 3.2(i), Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A.

15. Rule 5.1, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A.

16. Complainant's Exhibit 7 is a letter from Jeff McGrew, who evidently offices with the respondent, indicating that a check is being forwarded in the amount of $440.00 for payment of the Cates' claim.

tains no information regarding the facts surrounding the grievance. Rather, it simply provides that "appropriate measures have been made and the problem has been corrected."

¶ 9 With little cooperation from the respondent, the County Bar returned the respondent's file to the Bar Association which contacted him on January 17, 2001, advising him of Trinidad's complaint and again asking for a full and fair response within 20 days. The respondent answered the following day—again with a letter simply stating that he thought the matter had been resolved, and that Trinidad had been paid. This letter was followed by two letters from the Bar Association dated February 13th and 15th, 2001. The February 15th letter specifically advised the respondent that his response did not satisfy the requirement for a full and fair disclosure and listed the specific items which the respondent should include in reply.[17] The respondent answered this request by faxing the Bar Association a copy of his settlement computation sheet and a letter to Cates forwarding him one of Trinidad's bills. The only explanation accompanying the response was a handwritten note on the front of the transmittal sheet indicating that the respondent was "in the process" of ordering the original check made out to Cates and that he was "still looking" for the physical file.

¶ 10 Because of his lack of diligence in responding, the Bar Association took the respondent's deposition on April 17, 2001. At that time, the Bar Association again requested trust account records and the respondent indicated that he would provide them. On June 5, 2001, the respondent wrote the Bar Association indicating that he had attempted to obtain the trust account records, but that he had been advised by a bank employee that the records were "illegible." Nevertheless, the Bar Association subpoenaed trust account records from the respondent's bank for the months of October through December of 1996. When received, the records were easily readable and revealed that the respondent had been using the trust account as his personal checking account and during the time period, four checks had been returned due to insufficient funds. The respondent did supply trust account records for the months of July and August of 1999. These records reflect that a total of fourteen checks were returned for insufficient funds during the two-month period.

¶ 11 The respondent's only reply of any substance is dated July 11, 2001—and was supplied only after almost eight months of inquiries and the taking of the his deposition. In the letter, the respondent explained that at least a portion of the checks denied in 1999 resulted from a $9,000.00 deposit which had been put on hold. He also stated that when he was originally contacted about the grievance, he was involved in a complex criminal trial and was out of the office for the majority of a four-month period.

¶ 12 On September 13, 2001, the Bar Association filed this cause as a Rule 6 proceeding.[18] A hearing was conducted before the trial panel on April 17, 2001. On June 10, 2002, the trial panel filed its report. It found clear and convincing evidence to support the charges of mishandling of the trust account and failure to make a full, fair and timely response to the investigation. It recommended that: the respondent be suspended for thirty days; publicly reprimanded; and costs be imposed. The trial panel and the Bar Association agree that the discipline rec-

**17.** The Bar Association's February 15th, 2001, letter provides in pertinent part:

"... I would suggest that your response include, but not be limited to, the following, which might prevent our need to take your deposition regarding this matter:
1. Background information about the case and client involved.
2. Complete information regarding the settlement of the case.
3. Bank records showing deposit of any settlement checks, and copies of all monthly statements from time of deposit of the settlement checks until final payment of all amounts due to all parties.
4. Copies of settlement statement and any releases.
5. Copies of any relevant court documents, if a case was filed.
6. Copies of checks for any and all distributions of settlement funds.
7. A complete explanation of why you had a check drawn on your trust account returned for insufficient funds...."

**18.** Rule 6, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A.

ommended is appropriate and that there is insufficient evidence to support the charges of misappropriation and misrepresentation. The Court ordered briefing cycle was concluded with the Bar Association's waiver of a reply brief filed on July 30, 2002. On August 1, 2002, the Bar Association's unopposed application to assess costs was received.

## I.

¶13  **CLEAR AND CONVINCING EVIDENCE SUPPORTS DETERMINATIONS OF MISMANAGEMENT OF A TRUST ACCOUNT AND FAILURE TO COOPERATE IN THE GRIEVANCE PROCESS.**

¶14  The trial panel and the Bar Association recognize that there is insufficient evidence to support charges of misappropriation and misrepresentation. The respondent, the trial panel and the Bar Association agree that clear and convincing evidence supports the charges of mismanagement of a trust account and uncooperativeness in the investigative process by being untimely in responding and neglecting to make a full and fair disclosure. Upon a *de novo* review, we agree.

¶15  In disciplinary matters, this Court possesses exclusive original jurisdiction.[19] We are not bound by agreed findings, conclusions of law or recommendations for discipline.[20] Rather, the ultimate responsibility for imposition of professional discipline is ours alone. The Court's review is *de novo* in considering the record presented as well as the recommendations for discipline.[21] Before we may impose discipline upon an attorney, the charges must be established by clear and convincing evidence.[22]

¶16  Three levels of culpability are employed when an attorney mishandles client funds with ascending degrees of seriousness. The least offensive—commingling—occurs when an attorney fails to keep client moneys in an account separate from that of the attorney. The next serious offense—simple conversion—exists when the attorney uses client funds for a purpose other than that for which they are intended. Finally, an attorney commits misappropriation when the lawyer purposefully deprives a client of moneys through deceit and fraud.[23]

¶17  The Bar Association failed to establish that the respondent converted or misappropriated client funds or monies earmarked for the payment of providers' bills. Further, it did not establish that the respondent misrepresented the facts surrounding the settlement procedure. Cates, the only witness presented on the Bar Association's behalf, was unconvincing. He admitted not having a clear memory of the facts nor did he believe that the respondent appropriated any of his funds. Additionally, the respondent's testimony was supported by that of two of his employees. By June, 2001, all medical bills had been paid.[24]

¶18  A review of bank records reveals clearly that the respondent used his trust account as a personal checking account—commingling client monies with his personal funds and paying ordinary household and other expenses from the account and that he has—with some regularity—issued checks for which there were insufficient funds available. Further, despite a minimum of eight inquiries from investigating officials, the respondent repeatedly failed to respond with detailed facts and circumstances surrounding the grievance. He de-

**19.** Rule 1.1, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A; *State ex rel. Oklahoma Bar Ass'n v. Holden,* see note 7, supra; *State ex rel. Oklahoma Bar Ass'n v. McMillian,* 1989 OK 16, ¶5, 770 P.2d 892.

**20.** *State ex rel. Oklahoma Bar Ass'n v. Erickson,* 2001 OK 66, ¶14, 29 P.3d 550; *State ex rel. Oklahoma Bar Ass'n v. Israel,* see note 6, supra.

**21.** *State ex rel. Oklahoma Bar Ass'n v. Israel,* see note 6, supra; *State ex rel. Oklahoma Bar Ass'n v. Bolusky,* 2001 OK 26, ¶14, 23 P.3d 268; *State ex rel. Oklahoma Bar Ass'n v. Dershem,* 2001 OK 7, ¶12, 21 P.3d 639.

**22.** Rule 6.12, Rules Governing Disciplinary Proceedings, see note 7, supra; *State ex rel. Oklahoma Bar Ass'n v. Wolfe,* see note 7, supra; *State ex rel. Oklahoma Bar Ass'n v. Meek,* see note 7, supra; *State ex rel. Oklahoma Bar Ass'n v. Holden,* see note 7, supra.

**23.** *State ex rel. Oklahoma Bar Ass'n v. Dunlap,* 1994 OK 81, ¶¶13–16, 880 P.2d 364; *State ex rel. Oklahoma Bar Ass'n v. Cummings,* 1993 OK 127, ¶¶23–25, 863 P.2d 1164.

**24.** See ¶¶5–6 and accompanying footnotes, supra.

layed the provision of trust account records. His explanation that some delay was caused by "illegible" copies is unconvincing considering the Bar Association's success in retrieving readable records from his banking institution under subpoena. Therefore, we determine that there is clear and convincing evidence of the respondent's mismanagement of his trust account and his failure to cooperate in the grievance process.

## II.

### ¶ 19 THE MISCONDUCT WARRANTS A THIRTY–DAY SUSPENSION AND THE IMPOSITION OF COSTS.

¶ 20 Although the Bar Association originally sought a two-year suspension, it now is in agreement with the trial panel that the respondent should be publicly censured, suspended for thirty days and required to pay costs. The respondent asserts that suspension is unwarranted. We disagree.

¶ 21 Discipline is administered to preserve public confidence in the bar. Our responsibility is not to punish but to inquire into and gauge a lawyer's continued fitness to practice law, with a view to safeguarding the interest of the public, of the courts and of the legal profession. Discipline is imposed to maintain these goals rather than as punishment for the lawyer's misconduct.[25] Disciplinary action is also administered to deter the attorney from similar future conduct and to act as a restraining vehicle on others who might consider committing similar acts.[26] Discipline is fashioned to coincide with the discipline imposed upon other lawyers for similar acts of professional misconduct.[27] Although this Court strives to be evenhanded and fair in disciplinary matters, discipline must be decided on a case-by-case basis because each situation involves unique transgressions and mitigating factors.[28]

¶ 22 Discipline in attorney misconduct proceedings with facts similar to those present here has ranged from a public reprimand to a two-year suspension.[29] Discipline should be sufficient to persuade the attorney that such conduct will not be tolerated.[30] Mitigating circumstances may be

25. *State ex rel. Oklahoma Bar Ass'n v. Smith,* 1980 OK 126, ¶ 21, 615 P.2d 1014; *State ex rel. Oklahoma Bar Ass'n v. Lowe,* 1982 OK 20, ¶ 19, 640 P.2d 1361.

26. *State ex rel. Oklahoma Bar Ass'n v. Cummings,* see note 23 at ¶ 19, supra; *State ex rel. Oklahoma Bar Ass'n v. Hall,* 1977 OK 117, ¶ 12, 567 P.2d 975.

27. *State ex rel. Oklahoma Bar Ass'n v. Patterson,* 2001 OK 51, ¶ 29, 28 P.3d 551; *State ex rel. Oklahoma Bar Ass'n v. Eakin,* 1995 OK 106, ¶ 0, 914 P.2d 644; *State ex rel. Oklahoma Bar Ass'n v. Bolton,* 1994 OK 53, ¶ 16, 880 P.2d 339.

28. *State ex rel. Oklahoma Bar Ass'n v. Doris,* 1999 OK 94, ¶ 38, 991 P.2d 1015; *State ex rel. Oklahoma Bar Ass'n v. Rozin,* 1991 OK 132, ¶ 10, 824 P.2d 1127.

29. *State ex rel. Oklahoma Bar Ass'n v. Simank,* 2001 OK 13, ¶ 20, 19 P.3d 860 [Persistent failure of an attorney to respond in grievance proceedings and uncooperativeness in the process sufficient for imposition of a public reprimand.]; *State ex rel. Oklahoma Bar Ass'n v. Abbott,* 2000 OK 64, ¶ 16, 11 P.3d 1239 [Public censure and payment of costs imposed for negligently commingling personal and trust account funds and failing to respond to the Bar Association's inquiry where the attorney also suffered from depression, acknowledged his wrongdoing and showed remorse.]; *State ex rel. Oklahoma Bar Ass'n v. Taylor,* 2000 OK 35, ¶ 36, 4 P.3d 1242 [Attorney suspended for thirty days for mishandling insurance settlement proceeds belonging to a physician, failing to properly supervise employees and failing to timely and accurately respond to a grievance.]; *State ex rel. Oklahoma Bar Ass'n v. Dunlap,* see note 23 at ¶¶ 23–25, supra [Mismanagement of a trust account warranted a public censure where the attorney fully cooperated in the grievance process.]; *State ex rel. Oklahoma Bar Ass'n v. McManus,* 1993 OK 66, ¶ 13, 852 P.2d 727.[Public censure and payment of costs imposed where attorney failed to respond to a grievance, commingled personal funds in a trust account and neglected client matters and the discipline was recommended by both the trial panel and the Bar Association.]; *State ex rel. Oklahoma Bar Ass'n v. Payne,* 1988 OK 1, ¶¶ 4–6, 748 P.2d 989 [Failure to deposit client funds in a trust account sufficient to impose a public reprimand and the payment of costs.]; *State ex rel. Oklahoma Bar Ass'n v. Hensley,* 1977 OK 23, ¶ 12, 560 P.2d 567 [Attorney suspended for two years on charges of commingling where clients were deprived of their funds for approximately four months.]; *State ex rel. Oklahoma Bar Ass'n v. Kamins,* 1977 OK 103, ¶¶ 7–8, 568 P.2d 627 [The same discipline was imposed under similar circumstances where the client was deprived of funds for a period of one year.].

30. *State ex rel. Oklahoma Bar Ass'n v. Miskovsky,* 1997 OK 55, ¶ 15, 938 P.2d 744.

considered in evaluating both the attorney's conduct and assessing the appropriate discipline.[31]

¶23  In mitigation, we may consider that: no grave economic harm occurred and all medical care providers have now been paid;[32] the respondent has not been previously disciplined; the respondent admits that he engaged in the charges involving mishandling of funds and failure to respond accurately and fully; and the respondent no longer accepts client or third-party funds which negates the need for a trust account.  On the other hand, the respondent was never able to produce his client's file; gave confusing or unconvincing answers concerning his ability to reproduce the settlement sheet; delayed the provision of trust records; used his trust account as a personal checking account; issued a number of checks when funds were unavailable; and was not diligent in responding to the grievance inquiries and repeatedly provided woefully insufficient information.

¶24  This Court is the ultimate arbiter of appropriate sanctions in bar discipline cases.[33]  We may choose to reject or to accept the trial panel's recommendations.[34]  Here, the trial panel's suggested sanctions are appropriate.  Therefore, we determine that the respondent's misconduct, his lack of a prior disciplinary history and discipline administered in similar cases warrants a thirty-day suspension and the payment of $1,758.91 in costs.[35]

## CONCLUSION

¶25  The nondelegable, constitutional responsibility to regulate both the practice and the ethics, licensure, and discipline of the practitioners of the law is solely vested in this Court.[36]  Upon a *de novo* review of the record, we determine that the respondent mismanaged his trust account and failed to cooperate in the grievance process.  The respondent's misconduct warrants a thirty-day suspension and the payment of $1,758.91 in costs.

## RESPONDENT SUSPENDED; COSTS IMPOSED.

All Justices concur.

**31.**  *State ex rel. Oklahoma Bar Ass'n v. Southern,* 2000 OK 88, ¶35, 15 P.3d 1; *State ex rel. Oklahoma Bar Ass'n v. Taylor* 2000 OK 35, ¶33, 4 P.3d 1242.

**32.**  Restitution, in and of itself, will not mitigate the need for discipline.  *State ex rel. Oklahoma Bar Ass'n v. Raskin,* 1982 OK 39, ¶19, 642 P.2d 262.

**33.**  *State ex rel. Oklahoma Bar Ass'n v. Rennie,* 1997 OK 108, ¶20, 945 P.2d 494; *State ex rel. Oklahoma Bar Ass'n v. Butler,* 1992 OK 150, ¶9, 848 P.2d 540.

**34.**  *State ex rel. Oklahoma Bar Ass'n v. Rennie,* see note 34, supra; *State ex rel. Oklahoma Bar Ass'n v. Wilkins,* 1995 OK 59, ¶12, 898 P.2d 147.

**35.**  The Bar Association submitted an application to assess costs of $1,758.91.  The costs are itemized and copies of the bills associated with the proceeding are attached to the application.  The respondent has not filed a response to the application.  He is responsible for the costs of the disciplinary proceeding.  Rule 6.16, Rules Governing Disciplinary Proceedings, see note 8, supra.

**36.**  *State ex rel. Oklahoma Bar Ass'n v. Holden,* see note 7, supra; *State ex rel. Oklahoma Bar Ass'n v. Farrant,* 1994 OK 13, ¶8, 867 P.2d 1279; *Tweedy v. Oklahoma Bar Ass'n,* 1981 OK 12, ¶4, 624 P.2d 1049.