STATE ex rel. OKLAHOMA BAR ASSOCIATION v. BURTON



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:STATE ex rel. OKLAHOMA BAR ASSOCIATION v. BURTON

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 STATE ex rel. OKLAHOMA BAR ASSOCIATION v. BURTON
2021 OK 9
Case Number: 6846
Decided: 02/23/2021
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2021 OK 9, __ P.3d __

 

 

STATE OF OKLAHOMA ex rel., OKLAHOMA BAR ASSOCIATION, Complainant,
v.
CHARLES ROBERT BURTON, IV, Respondent.

ORIGINAL PROCEEDING FOR ATTORNEY DISCIPLINE

¶0 The Complainant charged the Respondent with three counts of professional misconduct that included failure to competently represent clients, failure to be diligent in representation of clients, and failure to communicate effectively with clients. In addition, the Complainant charged the Respondent with mishandling of client funds, creating a conflict of interest, failure to withdraw after termination, charging unreasonable fees, misrepresenting facts during the investigation, dishonesty, and failure to timely and adequately respond to the investigation. Having found clear and convincing evidence to support all three counts, the Professional Responsibility Tribunal recommended the Respondent be disbarred. We hold there is clear and convincing evidence that the totality of the Respondent's conduct warrants disbarment. The Respondent is ordered to pay the costs as herein provided within ninety days after this opinion becomes final.

RESPONDENT DISBARRED.
COSTS CHARGED TO RESPONDENT

Katherine Ogden, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, Oklahoma, for Complainant.

Sheila J. Naifeh, Tulsa, Oklahoma, for Respondent.

COMBS, J.:

¶1 The Complainant, State of Oklahoma ex rel. Oklahoma Bar Association (Complainant), began proceedings pursuant to Rule 6 of the Rules Governing Disciplinary Proceedings (RGDP), 5 O.S. 2011, ch. 1, app. 1-A, alleging three separate counts of misconduct against the Respondent, Charles Robert Burton, IV (Respondent), i.e., the Miller Grievance, the Campbell Grievance, and the Studebaker Grievance. The Complainant alleges the Respondent's actions are in violation of multiple rules of the Oklahoma Rules of Professional Conduct (ORPC), 5 O.S. 2011, ch. 1, app. 3-A, and the RGDP and are cause for professional discipline. The Complainant also requests an enhancement of discipline based upon Respondent's October 28, 2016 Private Reprimand by the Oklahoma Bar Association's Professional Responsibility Commission. This matter was assigned to this office on September 3, 2020.

I. Facts and Procedural History

¶2 The Respondent has been a member of the Oklahoma Bar Association (OBA) since 1990. His membership is currently suspended for failure to comply with mandatory continuing legal education (MCLE) requirements and failure to pay bar dues.[1] Prior to the present proceeding and his suspension, Respondent had a single Private Reprimand in his almost thirty-year career.

¶3 The Complainant filed its Formal Complaint against the Respondent on September 27, 2019. The hearing on the matter was set for November 20th and 21st, 2019. On October 30, 2019, the Respondent filed a Motion for Continuance of the hearing and Motion for Leave to File Out of Time (his Answer). The Motion for Continuance stated that no further continuances will be contemplated or sought. Both were granted on November 6, 2019, and a new hearing date was set for January 29th and 30th, 2020 and the filing of his Answer was extended to November 16, 2019.[2] Without further extensions requested, the Respondent untimely filed his Answer on November 21, 2019. The Professional Responsibility Tribunal (PRT) entered a Scheduling Order on December 4, 2019, which required the Respondent to submit a final list of witnesses by December 13, 2019. The Respondent did not comply with this order.

¶4 On January 2, 2020, the Respondent filed a (2nd) Motion for Continuance. The Motion states the Respondent would benefit from a mental health assessment in anticipation of the hearing and that a doctor's appointment was scheduled for January 14, 2020. It also provided that no further continuances will be contemplated or sought. The Complainant's Brief in Chief notes that the Respondent did not complete the mental health assessment.[3] On January 14, 2020, the PRT granted a continuance of the hearing until March 18th and 19th, 2020. The order required a final witness list be submitted by January 29, 2020 and a final exhibit list be submitted by February 26, 2020. Without an extension of time, the Respondent untimely filed his final witness list on January 30, 2020.

¶5 On March 16, 2020, Respondent filed a (3rd) Motion for Continuance.[4] The motion alleges that the Respondent informed his counsel on Sunday, March 15, 2020, he was ill with a severe upper respiratory infection and may not be well by the March 18, 2020, hearing.[5] It further alleged a continuation would be prudent in light of the recent Covid-19 issues. Over the Complainant's opposition, the PRT granted the motion and continued the hearing to May 28th and 29th, 2020.

¶6 On May 28th and after being subpoenaed,[6] the Respondent did not appear for the hearing before the PRT in Oklahoma City; the Respondent was in Tulsa, Oklahoma. His counsel stated she received a call from the Respondent that morning at 8:00 a.m., approximately one hour before the hearing was to start, telling her he had gone to "OSU Tulsa...the day before yesterday" and further went to a website concerning Covid-19 and plugged in information.[7] He stated public health officials recommend that he be tested for Covid-19. He took the test but did not have the results. When he called her that morning he said he had fatigue and chills. He told her he had to quarantine. His counsel did say that she previously thought that he would be attending the hearing.

¶7 There was a discussion about using electronic applications such as BlueJeans and FaceTime to allow the Respondent to participate. Several recesses were made in the morning to try to accommodate the Respondent. The Respondent's counsel objected to continuing the hearing without her client being present but the Presiding Master noted the only thing we have is a diagnosis of bronchitis and that is not an adequate cause to delay the hearing.[8] He stated, "we have been delaying the proceeding to allow him to participate."[9] The Assistant General Counsel provided precedent to the PRT which upheld a disciplinary hearing when a respondent failed to appear after being given proper notice.[10]

¶8 The Respondent's counsel was on the phone with the Respondent many times. She indicated at one point he was walking to her law office in Tulsa to use her facilities. He had a cell phone and was sending her pictures of where he was walking. When he got to the law office her employees did not want him to come inside and threw him out because he was coughing so much.[11] When it became clear the PRT was wanting to proceed with the hearing, the Respondent told his counsel he did not want to quarantine and he was going to get a ride, because he does not have a car, and he was going to come to Oklahoma City. This plan turned out to be false and he did not drive down to Oklahoma City. Ultimately, the Respondent was able to attend by electronic video conferencing through BlueJeans and FaceTime.[12] On the second day of the proceedings, May 29, 2020, the Respondent appeared in person. The PRT stated in its report, "[n]otably, Respondent did not present testimony or evidence of having been Covid-19 tested or exhibit any of the symptoms of illness during the second day of the hearing."[13]

¶9 Over the two-day proceeding, twelve witnesses, including the Respondent, testified either in person or via electronic means. The Complainant submitted sixty-two exhibits which were all admitted without objection and the Respondent submitted no exhibits. After the proceeding, the parties submitted proposed findings of fact and conclusions of law. The Respondent recommended a public censure. The Complainant recommended disbarment. The PRT issued its report on June 30, 2020, recommending the Respondent be disbarred.

II. Standard of Review

¶10 In Bar disciplinary proceedings, this Court possesses exclusive original jurisdiction. State ex rel. Oklahoma Bar Ass'n v. Holden, 1995 OK 25, ¶ 10, 895 P.2d 707. Our review of the evidence is de novo in determining if the Bar proved its allegations of misconduct by clear and convincing evidence. Rule 6.12(c), RGDP; State ex rel. Oklahoma Bar Ass'n v. Bolusky, 2001 OK 26, ¶ 7, 23 P.3d 268. Our goals in disciplinary proceedings are to protect the interests of the public and to preserve the integrity of the courts and the legal profession, not to punish the offending lawyers. State ex rel. Oklahoma Bar Ass'n v. Kinsey, 2009 OK 31, ¶15, 212 P.3d 1186. Whether to impose discipline is a decision that rests solely with this Court and the recommendations of the PRT are neither binding nor persuasive. State ex rel. Oklahoma Bar Ass'n v. Eakin, 1995 OK 106, ¶ 8, 914 P.2d 644.

III. Analysis

A. Count 1. The Miller Grievance

¶11 Respondent was one of several attorneys representing ten plaintiffs in a class action suit in the United States District Court for the Northern District of Oklahoma, Case No. CIV-12-411.[14] Jim Miller (Miller) testified he was the elected spokesman for the ten plaintiffs. Eight of the ten plaintiffs (Miller plaintiffs) became concerned with the Respondents actions on the case. Miller testified this included Respondent's procrastination in his work, including last minute filings, and the fact he dismissed some defendants without consulting the plaintiffs or their other attorneys.[15] Miller noted, one filing was literally made to the federal court just seconds before the midnight deadline and, without the help of one of their other attorneys, it most likely would not have been filed.[16] After meeting with the other plaintiffs and other counsel, eight of the ten plaintiffs chose to fire the Respondent.[17] Miller sent the Respondent an email on September 11, 2016, informing him this was a formal notice of dismissal by the eight Miller plaintiffs.[18] Two plaintiffs, Kevin and Joe Jeter, (Jeters or Jeter plaintiffs) elected to remain represented by the Respondent. On September 12, 2016, Miller followed up with a second email to the Respondent requesting he file a motion to withdraw by the next day.[19] The Respondent emailed Miller stating that he had a meeting with one of the other attorneys still representing the Miller plaintiffs and that "we will be expeditiously coordinating respective withdrawals" in the federal court.[20]

¶12 A year later, the Respondent had not filed a motion to withdraw. During this time and still as an attorney of record for the Miller plaintiffs, he conducted negotiations for a settlement in favor of the Jeter plaintiffs which the Miller plaintiffs opposed.[21] On September 5, 2017, Miller emailed the Respondent stating "[o]n September 13, 2016, you indicated in an email their [sic] would be a coordinated withdrawal. This has never happened and a coordinated withdrawal absolutely isn't necessary."[22] The email further requested he file a motion to withdraw by midnight, September 11, 2017. Two days later, Miller filed a grievance with the Complainant.[23] The Respondent responded to the grievance on October 5, 2017, and stated he would be happy to file a motion to withdraw so long as the Miller plaintiffs' counsel file a simultaneous motion to withdraw from representation of the Jeter plaintiffs.[24]

¶13 On November 5, 2017, Miller sent a letter to the Assistant General Counsel informing her that the Miller plaintiffs' counsel have filed a motion to withdraw in the federal case, and he attached an exhibit of the motion and order approving the motion.[25] On the same day, he sent the Respondent an email letting him know their motion to withdraw has been filed.[26] The Respondent replied claiming he has been busy lately with his ill mother and that he will file a motion to withdraw from the Miller plaintiffs within 48 hours. The Respondent failed to do so. A week later, November 14, 2017, Miller sent Les Arnold (Arnold), the OBA Investigator, a copy of the email and he explained that their request for the Respondent's withdrawal has been ongoing for over a year and the Respondent still has not filed a motion to withdraw from representing the Miller plaintiffs. The Complainant sent a letter to the Respondent requesting more information about the grievance. On or about November 27, 2017, the Respondent called to find out what they needed. Arnold testified that during this conversation the Respondent stated he had already withdrawn from the case in camera with the judge, but he could not provide any explanation as to why he would do such a thing.[27] The Respondent was then asked to provide a copy of the document he had filed in camera. He did not do so, and on January 2, 2018, the Complainant sent a letter to the Respondent reminding him that he was to provide additional documentation showing he had withdrawn from the case in camera and an explanation as to why no motion to withdraw appears to have been filed on the federal docket.[28] The Respondent was given a deadline of January 19, 2018, to provide this information. He did not provide this information and Arnold followed up with some phone calls to the Respondent but no one ever answered the phone.[29] Without further contact or explanation, the Respondent filed a motion to withdraw from representation of the Miller plaintiffs on January 26, 2018.[30] At the PRT hearing, the Respondent was asked why he falsely represented that he had already withdrawn in camera. The Respondent agreed that he should not have made that misrepresentation and refers to it as a "mistake."[31]

¶14 After the Respondent withdrew from representing the Miller plaintiffs he continued representing the Jeter plaintiffs in their pursuit of a settlement. Bill Federman, who at this time was representing the Miller plaintiffs, contacted the Complainant concerning the Respondent's behavior in the case.[32] He provided transcripts of the Settlement Agreement Approval Hearings (Fairness hearings).

¶15 The Fairness hearing was scheduled for November 8, 2018. United States District Judge, Terence C. Kern, presided and announced the parties were here for "final approval of the settlement agreement."[33] The Respondent arrived twenty to thirty minutes late.[34] The Respondent blamed his client, Kevin Jeter, for the reason they were late.[35] Kevin Jeter was the most involved in the case of the two Jeter plaintiffs and was the primary point of contact with the Respondent.[36] Kevin Jeter provided a much different account of the events.[37] He was to pick the Respondent up at a hotel where he was living and they were to go together to the hearing. He arrived at the hotel and the Respondent was not answering his phone. He had the clerk contact the Respondent and the Respondent told him to come to his hotel room. The door was propped open and the Respondent was taking a shower. Kevin Jeter became concerned because the Respondent was taking so long to get prepared and he did not want to be late. There were also many boxes they had to take to the courthouse. By the time the Respondent was ready they were already about fifteen minutes late. On the eight or so mile drive to the courthouse he asked whether the Respondent would contact the judge's clerk and let them know they were coming. The Respondent then called and told the clerk they were late because they had a problem with the elevator. Kevin was concerned about the Respondent's explanation and his truthfulness. When they finally arrived at the hearing, everyone was waiting on them in order to start. After a lengthy hearing, the court "reschedule[d] the remainder of [the] hearing" to a yet to be determined date.[38] Kevin later testified that the Respondent did not prepare Kevin for the hearing and that he was upset with the Respondent's performance at the hearing.[39]

¶16 The Fairness hearing was continued to January 4, 2019. Kevin Jeter, who was to attend this hearing, was not notified by the Respondent of the date of the continuance.[40] The night before the hearing, Kevin was visiting his family in Waco, Texas.[41] He received a text message from the Respondent around 8:30 p.m. asking Kevin to call him. The text message did not indicate what it was concerning. Kevin called the Respondent but received no answer. The Respondent then sent another text message saying that they will talk in the morning but again makes no mention of why he is contacting Kevin. The next morning Kevin tried to call the Respondent but again received no answer. Later in the morning, he received a call from one of the opposing counsel who informed Kevin that the continued hearing was "going on." Kevin could not be there in time so he contacted his brother Joe Jeter who was some sixty miles away to attend. Joe, with difficulty, was able to leave and eventually attend the hearing. Also later that morning, Kevin received another text message from the Respondent stating that the Respondent was very sick, but the message did not mention there was a scheduled hearing that day.

¶17 The Respondent did not attend the January 4, 2019 continued Fairness hearing. At the hearing, Judge Kern held a conference in his chambers. A record was made of both the conference and the hearing in the courtroom that followed.[42] The record reflects that approximately twenty minutes before the start of the hearing the Respondent called Judge Kern's office to say he had food poisoning and would not be able to attend the hearing. The Judge found the Respondent's excuse was not likely a truthful representation and he was concerned that the Respondent had other issues. He was also concerned with the Respondent's behavior at the November 8, 2018 hearing. At that hearing, the Respondent appeared disheveled, feverish and sweaty. He noted, other judges of the court had similar concerns about the Respondent and stated the Respondent had been removed from the federal criminal defender panel in June because of concerns of the court.[43] The Judge was also concerned with the Respondent's communication with the court, noting he never returns calls and on the day of the continued Fairness hearing he had the court clerk call the Respondent to remind him of the hearing but his voicemail was full. He also noted that the Respondent had failed to file for attorney fees and for a class representative fee in this case. The Judge, in open court, ruled that due to the problems with the Respondent as outlined in conference and specifically the fact that he did not even notify his client of the continued hearing, the Respondent would be removed as class counsel in this case.[44] Following this hearing, the Jeter plaintiffs terminated the Respondent and had to hire new counsel to represent them in this matter.[45]

¶18 The Complainant asserts and we agree that the Respondent committed many rule violations relating to this grievance. His failure to file a motion to withdraw for over a year after being terminated shows a clear violation of Rule 1.16, ORPC.[46] The Respondent lied to the Complainant concerning an in camera withdrawal from representation in violation of Rule 8.1, ORPC.[47] His representation of the Jeter plaintiffs in a settlement opposed by the Miller plaintiffs while still being an attorney of record for the Miller plaintiffs was a conflict of interest in violation of Rule 1.7 (a)(1), ORPC.[48] He admitted that his failure to withdraw was wrong and it created a conflict of interest.[49] The Respondent's actions also clearly and convincingly show he violated Rules 1.1[50], 1.3[51], and 1.4[52], ORPC.

B. Count 2. The Campbell Grievance

¶19 Jimmi Sewell Campbell (Campbell) had been charged with felony first degree murder on April 19, 2016, in Tulsa County Case No. CF-16-2080, along with another defendant, Chris Allen Wilson.[53] Campbell testified she had met the Respondent through a bondsman, Ryanne Hamilton, when she needed representation in an earlier federal wire-tap case.[54] The Respondent was paid from her trust fund for that representation.[55] On her murder case, she hired the Respondent when she was being booked, and at some point the Respondent brought in another attorney, Kevin Adams (Adams), to also represent Campbell. The Respondent did not discuss with Campbell about bringing in another attorney on the case "he just brought him on his own behalf."[56] He represented to Campbell that Adams was a trial attorney who would be good for this type of case.[57]

¶20 Adams testified that he would normally charge a flat fee of $35,000.00 but because the Respondent was also involved he reduced his fee to $25,000.00.[58] The Respondent prepared a written fee agreement to submit to Campbell's trust fund trustee which Campbell signed. The fee agreement provided that Campbell agrees to pay a fixed fee of $50,000.00 for their professional services "through the resolution of this matter at the trial level, this includes our services up to and including trial."[59] Although, the fee agreement did not specify how the money would be split, the attorneys split the $50,000.00 evenly.

¶21 There were two court hearings in May of 2016.[60] The Respondent appears to have been present with Campbell at those hearings. The preliminary hearing was held on June 21, 2016, and later that month an arraignment was held on June 27, 2016, which was passed.[61] Both Campbell and Adams testified that the Respondent did not appear for the preliminary hearing and after the June 27, 2016 initial arraignment hearing, he did not appear again.[62] Adams appeared with Campbell at approximately 9 to 10 additional court appearances extending into 2017 without the Respondent attending.[63] This included her sentencing on September 6, 2017; Campbell entered a blind plea after her charge had been reduced to accessory after the fact to murder.[64]

¶22 The Respondent testified at deposition on October 4, 2018, that he was there at the June 21, 2016 preliminary hearing and the docket showed that he was there.[65] The bondsman, Ryanne Hamilton, testified that the Respondent was at the courthouse that day.[66] At the PRT hearing the Respondent testified that he was in the gallery and left the hearing to work on another case.[67] A transcript of the preliminary hearing, where Campbell testified against the other defendant, only shows Adams being present and representing Campbell.[68] As mentioned, both Campbell and Adams testified that the Respondent did not attend the preliminary hearing and Adams vehemently denied that the Respondent was sitting in the gallery during the hearing.[69] The Respondent's billing records show he had billed Campbell for attending the preliminary hearing.[70]

¶23 Campbell and Adams testified as to what their understanding was when the Respondent and Adams agreed to represent Campbell. Campbell "expected him to be at every single [hearing]. . . . That's what you attorney is supposed to do . . . . That's why I paid him. That's a lot of money [$25,000.00] to show up to three court dates."[71] Adams testified he had expected the Respondent to be in the case the entire time.[72] After the June 27, 2016 arraignment, the Respondent "never showed back up again . . . . That was the last I ever heard from [the Respondent]" other than having a couple of conversations with him thereafter.[73] The Respondent "never showed up to any of the meetings with the district attorney when our client was going to testify or they were prepping our client to testify at trial. He didn't show up for the sentencing, the plea or sentencing."[74] The Respondent testified at the October 4, 2018 deposition, that Adams was crosswise with the Respondent due to the Miller case, and indicated to the Respondent that he would handle the remainder of the Campbell case.[75] Adams strongly disagreed and testified that he never told the Respondent that he had the Campbell matter handled; he never said, "hey, you don't have to worry about not showing up. Just forget about it."[76]

¶24 The Respondent's billing records he provided under subpoena represents he expended $24,975.00 worth of work on the case from April 27, 2016 to June 27, 2016, which was his last billing entry.[77] Of this, a majority ($15,175.00) is related to review of 145 pages of discovery received from the district attorney's office by Adams on May 18, 2016.[78] The Respondent testified that the amount of pages was more than 145 pages[79] but the receipt of discovery[80] shows as of the end of his billing records (June 27, 2016), only 145 pages had been provided. The $15,175.00 dollar amount reflects approximately 60.7 hours of alleged work.[81] Adams testified that this was a simple case and he himself only spent 3 to 4 hours reviewing this discovery.[82] Adams understood that the billing records were created in order to justify to the Complainant why the Respondent withdrew money from his trust account.[83] He testified that it just was not true that the Respondent spent 60.7 hours reviewing this discovery.[84] He believes the Respondent put down so much time reviewing discovery in order to show he earned his fee.[85]

¶25 In addition to the three undisputed court appearances the Respondent attended, he drafted a two-page Order on Rules and Conditions on Release.[86] He also billed for phone calls and texts, including some lengthy calls to the bondsman, Ryanne Hamilton, and some various other things.[87] The testimony at the PRT hearing revealed that Hamilton had been like a second mother to Campbell and Hamilton's communications with the Respondent had been mainly about Campbell's health and not the bond.[88]

¶26 After the June 27, 2016 arraignment, Adams solely appeared in court with Campbell for 9 or 10 appearances.[89] The Respondent testified that these other hearings were "perfunctory" even though the record shows it included the sentencing of his client.[90] One of his excuses for not attending was that he was trying to keep his travel expenses down so as not to have to bill Campbell for them.[91] However, a review of his billing records indicate he was including his travel expenses to justify his $25,000.00 fee. This is so even though the fee agreement provided that expenses would be in addition to the $50,000.00 representation fee and required prior client approval. There is nothing in the record to show any approval of expenses were ever made by Campbell. Therefore, we find his excuse for not attending the remaining court appearances to be disingenuous.

¶27 Campbell's testimony clearly reveals she felt abandoned after June 27, 2016.[92] Campbell also testified that Respondent would not answer her calls after his last court appearance. She testified, "[i]f he's working on my case, why isn't he answering my phone calls and showing up to my court date."[93]

¶28 On December 21, 2017, and three months after she was sentenced, Campbell filed a grievance against the Respondent explaining she believed he did next to nothing on her case and he stole her money.[94] On January 3, 2018, the Complainant sent a letter to Respondent's official roster address, requesting a response within two weeks.[95] The Respondent failed to respond. On February 14, 2018, the Complainant opened the matter for formal investigation and sent another letter requesting a response within twenty days.[96] The Respondent failed to respond. On March 29, 2018, the Complainant sent another letter to the Respondent warning him that he is violating Rule 5.2, RGDP[97] by not responding and notified him that failure to contact this office within 5 days will result in further action by the Complainant.[98] The Respondent contacted the Complainant on or before April 10, 2018. A letter written by the Complainant on the same day states that pursuant to the Respondent's request he will have until April 13, 2018 to respond to the grievance.[99] Again, the Respondent did not meet the deadline. Arnold testified that there were some phone contacts with the Respondent and the Respondent imposed a June 5, 2018 deadline to respond.[100] He did not respond by that deadline but did send an email to the Complainant on May 30, 2018, stating he had prepared a response and he was in the process of hiring an attorney to represent him and review his response.[101] The Complainant emailed him the same day and stated his attorney would need to make an entry of appearance "today with our office." That did not occur. The Complainant notified the Respondent by email on June 29, 2018, informing him that his response to the Campbell grievance was already 120 days late.[102] On September 14, 2018, the Complainant was forced to issue a subpoena duces tecum for the Respondent to appear at the Oklahoma Bar Center on October 4, 2018, to testify and produce records, including Campbell's file, billing records, notes and all other books, records, papers, documents, and other tangible evidence concerning the grievance.[103]

¶29 On October 4, 2018, the Respondent appeared for his deposition. He was represented by his counsel, Sheila Naifeh. At this deposition and for the first time, he produced his response to the grievance. He did not, however, produce all the subpoenaed documents and was given an extension of time to produce them.[104] He claimed his landlord had locked him out of his office and he could not get to some of his files. He also claimed he had some of these files on his computer but did not think he needed to bring them.[105] He was given until October 26, 2018 to produce these files but he failed to do so.[106] He also testified that the reason he did not file a response timely was that he was angry at Adams who he believes encouraged Campbell to file her grievance.[107]

¶30 At the PRT hearing, the Respondent was asked about the discovery he reviewed that he claims was in addition to the 145 pages and why he had not produced these documents which were part of the subpoena. He testified that, "[t]hey were in the office that I never had had access to or could get, but I have records of the computer version of them here. I should have produced those computer versions. That was a mistake. I could have gotten those."[108]

¶31 The Complainant asserts the Respondent's action show he failed to communicate or otherwise provide representation after abandoning Campbell's case. In addition, his charges for his services were unreasonable. We agree and find the Complainant has established by clear and convincing evidence the Respondent violated Rules 1.4 and 1.5 ORPC.[109] His conduct towards the Complainant during the investigation was also especially egregious and clearly violated Rule 5.2, RGDP. We find the Respondent misrepresented his attendance at Campbell's preliminary hearing in violation of Rule 8.1, ORPC. The Complainant also asserted the Respondent misrepresented that he could not get the documents he failed to provide. The Respondent did not provide all the subpoenaed documents and testified at the PRT hearing that he should have provided those. However, at the deposition he indicated that he had some files on his computer even though some of his files were locked in his office by his landlord. Therefore, we do not find the Complainant proved by clear and convincing evidence that he misrepresented that fact; he just did not provide all the subpoenaed documents.

C. Count 3. The Studebaker Grievance

¶32 In March 2017, the Respondent was retained by Loren Sells (Sells) to represent her in her capacity as personal representative of her husband's estate.[110] The Respondent and Sells had no written fee agreement or engagement letter for his services.[111] In March and April 2017, Sells paid the Respondent a total of $32,500.00 as a retainer which was paid from the estate.[112] The Respondent deposited this amount into his trust account and transferred it to his operating or personal account by the end of May, 2017; he spent the entirety of it by or within June 2017.[113] At a hearing on May 23, 2017, Sells was removed as the personal representative and Timothy Studebaker (Studebaker) was appointed in her place on June 5, 2017.[114] Soon thereafter, Sells hired Jack Brown (Brown) to represent her in her personal capacity and later terminated the Respondent.[115] In June 2017, Brown contacted the Respondent and asked whether he had obtained court approval for his attorney fees. The Respondent replied that he did not know he needed court approval and requested Brown to send him a copy of an application for attorney's fee.[116] Brown prepared and emailed him an application and order on June 20, 2017, all in a final form and ready to be filed, but the Respondent did not file the application.[117]

¶33 On November 10, 2017, Studebaker wrote the Respondent a letter requesting he provide detailed billing for the amounts he received from Sells as well as a court order approving his attorney fees.[118] The Respondent never responded to the letter and on December 1, 2017, Studebaker filed an embezzlement complaint pursuant to 58 O.S. 2011, §293. The complaint alleged the Respondent received estate funds and he failed to obtain approval of the court.[119] After several continuances, a hearing was held on March 1, 2018, wherein the court issued an order for the Respondent to provide the requested documents to Studebaker by March 16, 2018.[120] At this hearing, the Respondent claimed he was entitled to even more than the $32,500.00.[121] The Respondent was also ordered to appear to show cause at a contempt hearing on April 6, 2018. The Respondent did not provide the documents by March 16th as ordered but did appear at the contempt hearing with a large stack of documents.[122] At the contempt hearing, the Respondent represented he had 190 hours of work in this case from March 2, 2017 through June 10, 2017.[123] His produced billing records charged $350.00 per hour for a total of $66,500.00.[124] Studebaker testified that the only pleading the Respondent filed during that time was an entry of appearance and he made several court appearances; the Respondent did not file any of the typical pleadings in a probate case such as an inventory and notice to creditors.[125] The Respondent's produced records and billing statements included some duplicate billings and many charges for text messages and phone calls as well as travel time to Sells' home.[126] The parties agreed to forgo a trial and have the court make a determination about the reasonableness of the attorney fees charged by the Respondent. On April 16, 2018, the court held that the reasonable and necessary fee would be $300.00 per hour and the reasonable amount of work performed for the benefit of the estate was 47.3 hours for a total of $14,190.00. The court also ordered the Respondent to disgorge and refund to the estate $18,310.00. The Respondent appealed the order to this Court (DF-117,036). The appeal was dismissed because the Respondent failed to comply with this Court's order to file his notice of completion by December 4, 2018. To date, the Respondent has not refunded the $18,310.00 to the estate.[127] On May 23, 2018, Studebaker filed a grievance with the Complainant.[128]

¶34 The Complainant asserts the Respondent provided contrived and false billing records, converted and/or misappropriated funds from the estate, charged an unreasonable fee and failed to act with the requisite competence necessary for the proper practice of law in violation of Rules 1.1, 1.5, 1.15[129] and 8.4 (c), ORPC.[130]

¶35 As to the competence of the Respondent, he admitted this was the first probate that he handled as lead counsel but he had prior probate experience when he worked for other law firms.[131] He also indicated that he felt he needed to bring in Brown on the case, who is a seasoned trusts and estates lawyer.[132] The Respondent represented Sells for approximately three months and during this time it was determined little was done to further the estate. The court noted that over a six month period since Studebaker was appointed personal representative, the matter was settled and was ready for final accounting.[133] We have recently ruled a lawyer's lack of knowledge regarding how to receive payment of attorney fees in probate cases, in and of itself, was not evidence of a Rule 1.1, ORPC, violation. State ex rel. Oklahoma Bar Ass'n v. Gierhart, 2020 OK 72, ¶20, 473 P.3d 30. Although it appears he did very little to further the estate and he lacked knowledge that he needed court approval of his fees, he was in the case for only three months. We cannot say the Complainant has proven by clear and convincing evidence he lacked the required competency to practice in this area of the law.

¶36 We do find the Respondent violated Rules 1.5, and 1.15, ORPC. In Gierhart, we held the fact that a court approves only a quarter of what an attorney bills was not a clear violation of Rule 1.5. Id., ¶22. Gierhart, is distinguishable from this case. In Gierhart, the attorney's work progressed through the final accounting. Id., ¶10. Here, the record shows very little work was done to further the estate. The Respondent's billing emphasized communications, such as text messaging, some of which appear unsolicited and included items of a personal nature.[134] It also included some duplicate billings. The district court reduced his fee to about a quarter of what he billed. We have no difficulty here finding his fees were unreasonable for the work he performed and constituted a violation of Rule 1.5, ORPC.

¶37 In addition, the Respondent received a $32,500.00 retainer that he spent without court approval. Violations of Rule 1.15 can be sorted into three categories: (1) commingling, (2) simple conversion, and (3) misappropriation. Id., ¶23. Commingling occurs when client funds are combined with the lawyer's personal funds. Id. Simple conversion occurs when an attorney applies a client's money to a purpose other than that for which it came to be entrusted to the lawyer. Id. Misappropriation occurs when an attorney purposely deprives a client of money through deceit and fraud. Id. We find the Respondent's use of the retainer without court approval amounted to simple conversion in violation of Rule 1.15, ORPC. See State ex rel. Oklahoma Bar Ass'n v. Mansfield, 2015 OK 22, ¶29, 350 P.3d 108. The record does not provide by clear and convincing evidence that he misappropriated the funds, i.e., used deceit and fraud to purposefully deprive the estate of money when he transferred the retainer to his operating or personal account. At the time he transferred the money, he was convinced he had already earned the fee.[135] However, we do find clear and convincing evidence that the Respondent violated Rule 8.4 (c).[136] The retainer, for all intents and purposes, was completely spent by or within June 2017. Sometime that month he was notified he needed to seek court approval of his fees. Once he learned of the possibility that the court could reduce his fees after the retainer was spent, he ignored his obligation to seek approval and ignored the personal representative's requests. It took an embezzlement action to finally get him to account for his billing. We find his prolonged inaction and evasion of proper requests from the personal representative exhibited dishonesty and deceitfulness in the practice of law in violation of Rule 8.4 (c), ORPC.

IV. Discipline

¶38 Discipline is imposed to preserve public confidence in the Bar. State ex rel. Oklahoma Bar Ass'n v. Phillips, 2002 OK 86, ¶21, 60 P.3d 1030. Our goal is not to punish but to gauge an attorney's continued fitness to practice law in order to safeguard the interest of the public, the courts and the legal profession. Id. This Court also administers discipline to deter an attorney from similar future conduct and to act as a restraining vehicle on others who might consider committing similar acts. State ex rel. Oklahoma Bar Ass'n v. Townsend, 2012 OK 44, ¶31, 277 P.3d 1269. Discipline is fashioned to coincide with the discipline imposed upon other attorneys for like acts of professional misconduct. Id. This Court strives to be evenhanded and fair in disciplinary matters, yet discipline must be decided on a case-by-case basis taking into account the unique transgressions and mitigating factors. State ex rel. Oklahoma Bar Ass'n v. Mayes, 2003 OK 23, ¶25, 66 P.3d 398.

¶39 The Complainant has shown by clear and convincing evidence that the Respondent committed many rule violations. Both the Complainant and the PRT recommend the Respondent should be disbarred for his misconduct. The PRT was especially disturbed by the Respondent's conduct at the PRT hearing as well as his integrity, i.e., the "outright lie" he told the Complainant about an in camera motion to withdraw. The PRT noted that during the hearing the Presiding Master and court reporter felt compelled to admonish or direct Respondent on more than thirty-five separate occasions to quit interrupting the proceeding. The May 29, 2020 transcript of the PRT hearing is full of incidents where the Respondent was unresponsive in his answers and made numerous interruptions. The PRT felt his conduct and multitude of excuses throughout the investigation indicated the Respondent did not believe that deadlines and rules apply to him.

¶40 In State ex rel. Oklahoma Bar Ass'n v. Edwards, an attorney's conduct was found to have violated Rules 1.1, 1.3, 1.4, 8.1 (b), 1.15, 1.16, 8.4 (a)(c)(d), ORPC and Rules 1.3 and 5.2, RGDP. 2011 OK 3, ¶18, 248 P.3d 350. The attorney, who had not been previously disciplined, was found to have failed to provide competent representation, keep his clients informed, and promptly comply with reasonable requests for information. In addition, he wrote personal checks to himself from his client's trust account, failed to timely and adequately respond to the grievances filed against him, and made misrepresentations. We held the appropriate discipline was a suspension of two years and one day.

¶41 In Oklahoma Bar Ass'n v. Parker, a lawyer neglected his clients' legal matters, failed to communicate properly with clients, and failed to return unearned fees. 2015 OK 65, 359 P.3d 184. He was found to have violated Rules 1.1, 1.3, 1.4, 1.5, 1.16 and 8.4(c), ORPC, and Rule 1.3 and 5.2, RGDP. We noted for enhancement purposes a previous private reprimand for a violation of Rule 5.2, RGDP, where respondent did not timely respond to one grievance. We explained the proper discipline for respondent was to be disbarred from the practice of law.

¶42 In State ex rel. Oklahoma Bar v. Rowe, a lawyer failed to provide competent representation and act with reasonable diligence, failed to keep her clients informed, actively misled her clients about the status of their cases, commingled clients funds with her personal funds, failed to timely and adequately respond to grievances, and failed to provide requested materials to the OBA in spite of promising to do so. 2012 OK 88, 288 P.3d 535. We held her actions violated Rules 1.1, 1.3, 1.4, 8.1 (b), 1.15, 1.16 and 8.4 (a)(b)(c), ORPC and Rules 1.3 and 5.2, RGDP. The PRT recommended she be suspended from the practice of law for two years and one day. In determining discipline, we found "the respondent's conduct indicates a disregard of and indifference to her clients, to her law practice, to the rules of this Court and to the disciplinary process." Id., ¶31. We held she should be disbarred from the practice of law.

¶43 In State ex rel. Oklahoma Bar Ass'n v. Miller, an attorney, who had not been previously disciplined, was found to have misappropriated her client's funds and was disbarred. 2020 OK 4, 461 P.3d 187. In arriving at her discipline we were particularly disturbed by her lack of honesty:

[T]he totality of her misconduct is disturbing. It is our difficult duty to withdraw a license to practice law but we shall if necessary to protect the interest of the public and the legal profession as a whole. The record is laden with inconsistent statements and unbelievable explanations.

. . .

Honesty in the performance of a lawyer's professional activities is the foundation upon which his or her license stands. We hold the sum of the Respondent's misconduct warrants disbarment.

Miller, at ¶40.

V. Mitigation

¶43 The Respondent provided witnesses to support mitigation of discipline. Their testimony established the Respondent is a loving father and son who spent time caring for his ill mother. Magistrate Wilson testified that in his encounters with the Respondent in federal cases, he did not have "any concern about his ability to represent his clients" and "thought he was doing a fine job."[137]

 

VI. Enhancement

 

¶44 The Complaint also requests this Court enhance the Respondent's discipline based upon his previous Private Reprimand. On October 28, 2016, the Professional Responsibility Commission (PRC) disciplined the Respondent by Private Reprimand.[138] Similar to the Miller Grievance, the Respondent failed to withdraw from a case after a disagreement with his client. He was also found to have failed to provide diligent representation. In addition, it was determined the Respondent maintained at least fourteen trust accounts and used the accounts for operating and personal expenses. The PRC found no client funds were misappropriated but a minimal amount of client funds were commingled with his personal funds. The Respondent's actions violated Rules 1.1, 1.3, 1.15 and 8.4 (a), ORPC and Rule 1.3, RGDP. The PRC agreed to forego the filing of formal charges against the Respondent in exchange for his successful completion of the Attorney Diversion Program and acceptance of the Private Reprimand. The record reflects he accepted the reprimand and completed the program.

VII. Due Process

¶45 The Respondent was subpoenaed to testify at the PRT hearing. He did not appear on the first day of the proceeding due to an alleged illness and his concern about Covid-19. The PRT made many accommodations to allow the Respondent to participate. The proceeding was conducted via electronic means and the Respondent participated. The Respondent alleges his right to due process was violated because of the degradation in the quality of the proceedings. In State ex rel. Oklahoma Bar Ass'n v. Lobaugh, 1988 OK 144, ¶15, 781 P.2d 806 we held:

Due process in disciplinary proceedings contemplates a fair and open hearing before a trial panel with notice and an opportunity to present evidence and argument, representation by counsel, if desired, compulsory process for obtaining favorable witnesses, information concerning the claims of the opposing party, reasonable opportunity to be heard, and the right to confront the unfavorable witnesses. (This does not mean that a lawyer may thwart discipline by wilfully failing to attend a disciplinary hearing.) (emphasis added).

The record reflects the interruptions at the hearing were largely due to the Respondent's actions. Later in the morning of the hearing he represented that he would remove his self-imposed quarantine and get someone to drive him to the Oklahoma Bar Center. This did not occur. The Respondent's actions during the first day of the hearing caused numerous delays. This Court has upheld disciplinary hearings when a duly notified attorney fails to appear. See Whitebook, ¶21; State ex rel. Oklahoma Bar Ass'n v. Seratt, 2003 OK 22, ¶¶3-9, 66 P.3d 390. On the second day of the hearing, the Respondent appeared in person without any symptoms of illness and offered no testimony or evidence that he had been tested for Covid-19. Using an excuse of illness appears to be a common theme with the Respondent. We find his failure to personally appear on the first day of the PRT hearing was willful and the proceeding afforded him an opportunity to be heard so that he received his right to due process.

VIII. Conclusion

¶46 The Respondent has shown an utter disregard for the responsibilities placed upon him as a lawyer and member of the OBA. His chronic disregard of his obligations to respond to inquiries from the Complainant demonstrates an indifference bordering on hostility to the OBA and this Court. Additionally, his abhorrent behavior at the PRT hearings as well as his dishonesty during the bar investigation and other incidents reflected in the record is disturbing to this Court. The Respondent has also showed indifference to his law license. He is currently suspended for failure to comply with MCLE requirements as well as failure to pay his bar dues.[139] We hold, the Complainant has proven by clear and convincing evidence the Respondent violated Rules 1.1, 1.3, 1.4, 1.5, 1.7 (a)(1), 1.15, 1.16, 8.1 and 8.4 (c), ORPC and 5.2, RGDP. The Respondent's offered mitigation does little to sway the opinion of this Court. Taking into consideration the above violations, conduct and Private Reprimand, we find the recommended discipline is necessary to safeguard the interest of the public, the courts and the legal profession. Accordingly, it is ordered by this Court that the Respondent be disbarred and his name be stricken from the Roll of Attorneys licensed to practice law in this state. The Complainant's application to assess the costs of this proceeding in the amount of $7,057.55 is granted. The Respondent is ordered to pay the assessed amount within ninety (90) days.[140]

 

RESPONDENT DISBARRED.
COSTS CHARGED TO RESPONDENT

 

¶47 Darby, C.J., Kane, V.C.J., Kauger, Winchester, Edmondson, Combs, Gurich and Rowe, JJ., concur.

FOOTNOTES

[1] Order of Suspension for Failure to Comply with the Rules for Mandatory Continuing Legal Education, 2020 OK 71 (September 14, 2020); Order of Suspension for Nonpayment of Dues, 2020 OK 70 (September 14, 2020).

[2] Respondent's Motion for Leave to File Out of Time (filed October 30, 2019) states he was only able to hire counsel to represent him on October 29, 2019.

[3] Complainant's Brief in Chief at pg. 2, n.1.

[4] This is the same day (March 16, 2020) that this Court entered its order entitled First Emergency Joint Order Regarding the Covid-19 State of Disaster, 2020 OK 25, 462 P.3d 704.

[5] The PRT Report, June 30, 2020, indicates there was no documentation to support this. At the May 28, 2020, proceedings before the PRT, his counsel, Sheila Naifeh, stated she sent the Assistant General Counsel a letter from the Respondent's doctor, before the May 18th scheduled hearing, indicating that the Respondent had chronic bronchitis. Tr. of proceedings, May 28, 2020, at 19-20. This letter does not appear to be in the record.

[6] Tr. of proceedings, May 28, 2020, at 17.

[7] Id., at 3-4.

[8] Id., at 27.

[9] Id., at 20.

[10] Oklahoma Bar Ass'n v. Whitebook, 2010 OK 72, 242 P.3d 517.

[11] Tr. of proceedings, May 28, 2020, at 26.

[12] The Professional Responsibility Tribunal's (PRT) Report, June 30, 2020, at 2.

[13] Id., at 3.

[14] The record reflects the plaintiffs were also, early on, represented by the Richardson, Richardson, Boudreaux law firm and attorney Kevin Adams. CEX 2; Tr. of Proceedings, May 28, 2020, at 33-34.

[15] Tr. of Proceedings, May 28, 2020, at 34-36.

[16] Id., at 36, 53-54.

[17] Id., at 36-40.

[18] CEX 1, at 31.

[19] Id., at 32.

[20] Id., at 34. What the Respondent is indicating is that he intends to withdraw once the remaining attorneys representing the Miller plaintiffs also withdraw from representing the Jeter plaintiffs. Essentially, he is negotiating his withdrawal even though he was fired by the Miller plaintiffs.

[21] CEX, 4-5.

[22] CEX 1, at 35.

[23] CEX 58.

[24] CEX 7, at 8.

[25] CEX 7, at 1, 11; the motion was filed on October 16, 2017, and approved on October 27, 2017 (CEX 7, at 15).

[26] CEX 6.

[27] Tr. of proceedings, May 29, 2020, at 313-314.

[28] CEX 8.

[29] Tr. of proceedings, May 29, 2020, at 316.

[30] CEX 9.

[31] Tr. of proceedings, May 29, 2020, at 502.

[32] Id., at 316-318.

[33] CEX 12, at 5.

[34] CEX 14, at 152 (Judge Kern believed he was some twenty minutes late); Kevin Jeter testified he thought they were thirty minutes late, Tr. of proceedings, May 28, 2020, at 72.

[35] Tr. of proceedings, May 29, 2020, at 499.

[36] Tr. of proceedings, May 28, 2020, at 63, 69.

[37] Id., at 70-72.

[38] CEX 12, at 146; the Respondent testified adamantly that the Fairness hearing was to be in two separate hearings (Tr. of proceedings, May 29, 2020, at 504, 506; "No, it wasn't continued. There were two separate distinct hearings...."). However, it is clear from the transcript (CEX 12) that the first Fairness hearing was continued.

[39] Tr. of proceedings, May 28, 2020, at 74, 86. Kevin Jeter testified that he took parts of two days off to have the Respondent prepare him for the hearing but he received no preparation.

[40] Id., at 74.

[41] The testimony of Kevin Jeter setting out the events mentioned in this paragraph can be found in the Tr. of proceedings, at 74-79.

[42] CEX 14.

[43] The Respondent testified that this was not true, that as of January 4, 2019, he was still a member of the criminal defender panel. He even asserted he had "correspondence" to prove it. However, we find no evidence of this in the record. See Tr. of proceedings, May 29, 2020, at 592.

[44] At the PRT hearing the Respondent was asked if he recalled being removed as class counsel, he responded: "Well, that didn't do anything but hurt Robert...the Millers got what they wanted. The Millers won. They got to go on and get their lawyer, Mr. Federman, and proceed as opposed to Robert settling it and they're not going on. It hurt Robert." The Assistant General Counsel had the Respondent confirm that when he says "Robert" he is referring to himself in third person. Tr. of proceedings, May 29, 2020, at 507.

[45] Tr. of proceedings, May 28, 2020, at 81-82.

[46] Rule 1.16, ORPC, provides in pertinent part:

(a) Except as stated in paragraph (c), a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if:

. . .

(3) the lawyer is discharged.

[47] Rule 8.1, ORPC, provides in pertinent part:

An applicant for admission to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:

(a) knowingly make a false statement of material fact;

[48] Rule 1.17, ORPC, provides in pertinent part:

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client;

[49] Tr. of proceedings, May 29, 2020, at 598.

[50] Rule 1.1, ORPC, provides:

A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.

[51] Rule 1.3, ORPC, provides:

A lawyer shall act with reasonable diligence and promptness in representing a client.

[52] Rule 1.4, ORPC, provides:

(a) A lawyer shall:

(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(e), is required by these Rules;

(2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;
(3) keep the client reasonably informed about the status of the matter;
(4) promptly comply with reasonable requests for information; and
(5) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional conduct or other law.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

[53] CEX 22.

[54] Tr. of proceedings, May 29, 2020, at 287-289. Campbell also testified that she believed she had no written fee agreement in that case but thinks she paid the Respondent $3,000.00. She testified that the Respondent "would just call my trust attorney directly and say, 'Hey, I'm doing this for Jimmi, so I need this amount of a check,' and I believe that he did that a few more times without my consent." Id., at 303-304.

[55] Id., at 288.

[56] Id., at 290.

[57] Id., at 291.

[58] Tr. of proceedings, May 28, 2020, at 160.

[59] CEX 15.

[60] CEX 22.

[61] Id.

[62] Tr. of proceedings, May 28, 2020, at 117-118; Campbell testified the number of court appearances were in the high teens and the Respondent appeared for only 3 of them, while Adams appeared at all of them except one. Tr. of proceedings, May 29, 2020, at 278-281.

[63] Tr. of proceedings, May 29, 2020, at 582.

[64] CEX 25.

[65] CEX 15 at 39.

[66] Tr. of proceedings, May 29, 2020, at 406-407.

[67] Id., at 522-523.

[68] CEX 20.

[69] Kevin Adams testified "I can't tell you how many [people were in the gallery] but I can tell you who was not there, and [the Respondent] wasn't there;" Tr. of proceedings, May 28, 2020, at 173.

[70] CEX 18.

[71] Tr. of proceedings, May 29, 2020, at 280.

[72] Tr. of proceedings, May 28, 2020, at 117.

[73] Id., at 118.

[74] Id.

[75] CEX 15 at 51; as mentioned in n. 14, Kevin Adams was also representing the Miller plaintiffs.

[76] Tr. of proceedings, May 28, 2020, at 118-119.

[77] CEX 18; the Complainant had to subpoena his records (CEX 35) and the Respondent presented it at the October 4, 2018, deposition.

[78] Tr. of proceedings, May 29, 2020, at 521; CEX 16, 18.

[79] Tr. of proceedings, May 29, 2020, at 521.

[80] CEX 16.

[81] Id.

[82] Tr. of proceedings, May 28, 2020, at 125, 128.

[83] Id., at 128.

[84] Id., at 128-129.

[85] Id., at 129. The Respondent produced a billing record totaling almost exactly $25,000.00 ($24,975.00).

[86] CEX 23.

[87] CEX 18.

[88] Tr. of proceedings, May 29, 2020, at 410.

[89] It's unclear from the record whether or not the Respondent appeared in court on August 22, 2016.

[90] Tr. of proceedings, May 29, 2020, at 525; later at the PRT hearing he back-tracked from the use of the word "perfunctory" when questioned about it. Id., at 583.

[91] Tr. of proceedings, May 29, 2020, at 524-525.

[92] Tr. of proceedings, May 29, 2020, at 279-280.

[93] Id., at 285.

[94] CEX 27. She explained in her grievance that the Respondent did next to nothing on her case. He attended maybe 3 or 4 hearings then he went over 14 months without showing up or doing anything on her case. He was not present at her preliminary hearing, plea or sentencing and played no role in negotiating with the prosecution. He further, did not keep her informed. She believes he abandoned her as a client and feels like he stole her money.

[95] CEX 28.

[96] CEX 29.

[97] Rule 5.2, RGDP, provides:

After making such preliminary investigation as the General Counsel may deem appropriate, the General Counsel shall either (1) notify the person filing the grievance and the lawyer that the allegations of the grievance are inadequate, incomplete' or insufficient to warrant the further attention of the Commission, provided that such action shall be reported to the Commission at its next meeting, or (2) file and serve a copy of the grievance (or, in the case of an investigation instituted on the part of the General Counsel or the Commission without the filing of a signed grievance, a recital of the relevant facts or allegations) upon the lawyer, who shall thereafter make a written response which contains a full and fair disclosure of all the facts and circumstances pertaining to the respondent lawyer's alleged misconduct unless the respondent's refusal to do so is predicated upon expressed constitutional grounds. Deliberate misrepresentation in such response shall itself be grounds for discipline. The failure of a lawyer to answer within twenty (20) days after service of the grievance (or recital of facts or allegations), or such further time as may be granted by the General Counsel, shall be grounds for discipline. The General Counsel shall make such further investigation of the grievance and response as the General Counsel may deem appropriate before taking any action. (emphasis added).

[98] CEX 30.

[99] CEX 32.

[100] Tr. of proceedings, May 29, 2020, at 325.

[101] CEX 33.

[102] CEX 34.

[103] CEX 35.

[104] Tr. of proceedings, May 29, 2020, at 333-334; CEX 15 at 22-28.

[105] CEX 15 at 28.

[106] Tr. of proceedings, May 29, 2020, at 334.

[107] CEX 15 at 59.

[108] Tr. of proceedings, May 29, 2020, at 575.

[109] Rule 1.5, ORPC, provides in pertinent part:

A lawyer shall not make an agreement for, charge or collect an unreasonable fee or an unreasonable amount for expenses.

[110] Tr. of proceedings, May 28, 2020, at 188; CEX 38.

[111] CEX 53, at 14.

[112] Id., at 188-194; CEX 40, 42, and 61.

[113] Id.; Tr. of proceedings May 29, 2020, at 358-361; CEX 40-41.

[114] CEX 38.

[115] Tr. of proceedings, May 28, 2020, at 238-245.

[116] Id., at 239.

[117] CEX 56.

[118] CEX 42.

[119] CEX 43.

[120] CEX 52.

[121] CEX 51, at 19.

[122] Tr. of proceedings, May 28, 2020, at 204-205.

[123] CEX 53, at 19.

[124] CEX 60.

[125] Id., at 9-10.

[126] CEX 59-60.

[127] The Respondent testified that the reason he has not paid this money to the estate is due to his financial situation and he intends to comply with the order as soon as he is able to pay. Tr. of proceedings, May 29, 2020, at 555.

[128] CEX 42.

[129] Rule 1.15, ORPC, provides in pertinent part:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property.

[130] Rule 8.4 (c), ORPC, provides:

It is professional misconduct for a lawyer to:

. . .

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

[131] Tr. of proceedings, May 29, 2020, at 536, 587.

[132] CEX 53, at 13; Tr. of proceedings, May 28, 2020, at 233.

[133] Id., at 16.

[134] E.g., on March 10, 2017, the Respondent billed .20 hours for a text message that said: "Have a fabulous day you two; and, take some time today to 'smell the roses' (e.g., special lunch, walk in the park, a spontaneous trip to Saks for a hot new pair of heels). I shall see you Ms. Loren @ 5:30-6:00. Robert a/k/a 'The Lincoln Lawyer.'"

[135] Tr. of proceedings, May 29, 2020, at 555. The PRT found that the Respondent "did believe he had earned the fees that he paid from his IOLTA into his operating account." PRT Report, at 22.

[136] Rule 8.4 (c), ORPC, provides:

It is professional misconduct for a lawyer to:

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

[137] Tr. of proceedings, May 29, 2020, at 441-442.

[138] CEX 57, OBAD #2117. This Court has previously held it is proper to consider private reprimands in formulating discipline. State ex rel. Oklahoma Bar Ass'n v. Minter, 1998 OK 59, ¶17, 961 P.2d 208.

[139] This Court retains jurisdiction to impose discipline upon a lawyer who is currently suspended from the practice of law for non-payment of dues or for failure to complete mandatory continuing legal education. See, e.g., Rule 1.1, RGDP, wherein this Court retains jurisdiction to impose discipline even after an attorney has been stricken from the Roll of Attorneys for non-payment of dues or for failure to complete mandatory continuing legal education.

[140] Rule 6.16, RGDP.

 





 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Supreme Court Cases
 Cite
Name
Level

 1988 OK 144, 781 P.2d 806, State ex rel. Oklahoma Bar Ass'n v. Lobaugh
Discussed
 2001 OK 26, 23 P.3d 268, 72 OBJ 832, STATE ex. rel. OKLAHOMA BAR ASSN. v. BOLUSKY
Discussed
 1995 OK 25, 895 P.2d 707, 66 OBJ 1108, State ex rel. Oklahoma Bar Assn. v. Holden
Discussed
 1995 OK 106, 914 P.2d 644, 66 OBJ 3187, State ex rel. Oklahoma Bar Assn. v. Eakin
Discussed
 2002 OK 86, 60 P.3d 1030, STATE ex. rel. OKLAHOMA BAR ASSN. v. PHILLIPS
Discussed
 2003 OK 22, 66 P.3d 390, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. SERATT
Discussed
 2003 OK 23, 66 P.3d 398, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. MAYES
Discussed
 2009 OK 31, 212 P.3d 1186, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. KINSEY
Discussed
 2010 OK 72, 242 P.3d 517, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. WHITEBOOK
Discussed
 2011 OK 3, 248 P.3d 350, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. EDWARDS
Discussed
 2012 OK 44, 277 P.3d 1269, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. TOWNSEND
Discussed
 2012 OK 88, 288 P.3d 535, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. ROWE
Discussed
 2015 OK 22, 350 P.3d 108, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. MANSFIELD
Discussed
 2015 OK 65, 359 P.3d 184, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. PARKER
Discussed
 2020 OK 4, 461 P.3d 187, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. MILLER
Discussed
 2020 OK 25, 462 P.3d 704, FIRST EMERGENCY JOINT ORDER REGARDING THE COVID-19 STATE OF DISASTER
Discussed
 2020 OK 72, 473 P.3d 30, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. GIERHART
Discussed
 2020 OK 70, IN THE MATTER OF THE SUSPENSION OF MEMBERS OF THE OKLAHOMA BAR ASSOCIATION
Cited
 2020 OK 71, IN THE MATTER OF THE SUSPENSION OF MEMBERS OF THE OKLAHOMA BAR ASSOCIATION
Cited
 1998 OK 59, 961 P.2d 208, 69 OBJ 2097, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. MINTER
Discussed
Title 58. Probate Procedure
 Cite
Name
Level

 58 O.S. 293, Embezzlement Complaint - Citation
Cited


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA